File 1/19/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B263800 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA087683) |
| v. | |
| TRAMEL RAY JONES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Eric C. Taylor, Judge. Affirmed and remanded with directions.

Daniel G. Koryn, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Kathleen Kenealy, Acting Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, and Roberta L. Davis and Corey J. Robbins, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Tramel Ray Jones appeals from his judgment of conviction of one count of second degree murder (Pen. Code,[1] § 187, subd. (a)) and two counts of attempted willful, premeditated, and deliberate murder (§§ 664, 187, subd. (a)), with true findings on related firearm enhancements (§ 12022.53, subds. (c), (d), (e)(1)) and gang enhancements (§ 186.22., subd. (b)(1)). Jones, who was 16 years old at the time of the alleged crimes, raises the following arguments on appeal: (1) the prosecution improperly exercised its peremptory challenges to excuse African-American prospective jurors in violation of *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*); (2) the trial court erred in admitting Jones's pretrial statement to the police in violation of his Fifth Amendment right against self-incrimination and Fourteenth Amendment right to due process; and (3) Jones's aggregate sentence of 80 years to life in state prison violated his Eighth Amendment right against cruel and unusual punishment. We affirm and remand with directions.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

**I.   The Charges**

In a March 10, 2014 information, the Los Angeles District Attorney charged Jones with three counts of attempted willful, premeditated, and deliberate murder (§§ 664, 187, subd. (a)) [counts 1 through 3], one count of shooting at an occupied motor vehicle (§ 246) [count 4], and one count of murder (§ 187) [count 5]. As to each count, it was alleged that Jones committed the offense for the benefit of, at the direction of, or in association with a criminal street gang, and with the specific intent to promote,

_____

[1]   All further statutory references are to the Penal Code.

2

further, or assist in criminal conduct by gang members within the meaning of section 186.22, subd. (b)(1). It also was alleged that a principal personally and intentionally discharged a firearm in the commission of the offenses within the meaning of section 12022.53, subdivisions (c), (d), and (e)(1). Jones pled not guilty to each count and denied the enhancement allegations.

## II. The Evidence at Trial
### A. The November 21, 2012 Shooting [Counts 1-2]

In counts 1 and 2, Jones was charged with the attempted willful, premeditated, and deliberate murders of Early Smith and Demajah Strawn. On November 21, 2012, at around 11:00 p.m., Smith and Strawn were walking on 110th Street near Budlong Avenue in Los Angeles. The area was claimed by a gang known as the Hoover Criminals. Neither Smith nor Strawn were gang members or carrying a weapon. While walking to Smith's home, they passed by an apartment building where a group of men and women were gathered outside. The group dispersed as Smith and Strawn walked by, but no words were exchanged. Moments later, a young Black man in a white t-shirt approached Smith and Strawn from behind and fired multiple shots at them with a handgun. One of the bullets struck Smith in the buttocks and groin area. None of the shots hit Strawn. Eight .40 caliber casings were recovered from the scene shortly after the shooting.

Los Angeles County Sheriff's Detective Derek White later interviewed Smith and Strawn about the shooting and showed them photo arrays that included Jones. Smith stated that he never saw the shooter and could not make an identification. Strawn provided a general description of the shooter, but also stated that he did not get a good look at his face. When shown the photo array, Strawn indicated that Jones looked "familiar."

3

Strawn was not certain if Jones looked familiar from the shooting, but at one point, he told Detective White that Jones was "possibly the shooter." Strawn also told the detective that he had seen Jones in the area a second time after the shooting occurred.

At trial, neither Smith nor Strawn identified Jones as the shooter. Both men testified that they started running as soon as the shots were fired, and that they never saw the shooter's face. Strawn also testified that Jones was familiar to him because he had seen Jones in the area a few weeks before the shooting, but did not see him any time afterward. Strawn admitted that he did not want to testify at trial because he was afraid of retaliation from the Hoover gang.

### B.    The February 12, 2013 Shooting [Counts 3-4]

In counts 3 and 4, Jones was charged with the attempted willful, premeditated, and deliberate murder of an unidentified victim, John Doe, and with shooting at an occupied vehicle. Both counts arose out of a shooting that occurred on February 12, 2013 in the area of 112th Street and Budlong Avenue. On that date, at around 7:15 p.m., Derrick Jackson and his son, Jerrick, were at the home of Jackson's mother. While Jackson and Jerrick were standing near the front porch of the residence, three young Black men approached them. One of the men asked Jerrick where he was from, and Jerrick answered that he was not in a gang. The men walked away from the residence toward the street. A dark-colored car then drove by, followed by a red car. The three men yelled "Hoover" at one of the passing cars and walked into the middle of the street. One of the men fired a gun multiple times in the direction of that car. All three men then ran from the area. Six .40 caliber casings were recovered from the scene shortly

4

after the shooting.  The driver of the car that appeared to be the target of the shooting was never identified.

John Marshall was on the front porch of his residence near 112st Street and Budlong Avenue at the time of the shooting.  In an interview with the police at the scene, Marshall provided a physical description of the three men that he had seen yelling "Hoover" at a passing car immediately before the shooting began.  At trial, however, Marshall denied that he had witnessed the shooting or had described any of the suspects to the police.  Jackson also was interviewed by the police and was later shown a photo array that included Jones.  Jackson was able to provide a physical description of two of the suspects, but could not identify anyone in the photos.  Both Jackson and Marshall were aware of gang violence in the area where the shooting occurred and were reluctant to testify at trial because of fear of retaliation.

### C. Police Investigation of the November 21, 2012 and February 12, 2013 Shootings

#### 1. Physical Evidence

On March 1, 2013, the police executed a search warrant at the apartment of Jones's father, located in the same area where the November 21, 2012 and February 12, 2013 shootings occurred.  During the search, the police forced entry into a locked bedroom where they found Jones's father.  Inside the bedroom, the police recovered a loaded .40 caliber Glock handgun, a loaded nine-millimeter Sig Sauer handgun, rock cocaine, and documents connecting Jones's father to the moniker "Baby Head."  A ballistics examination showed that the casings recovered from scenes of both the November 21, 2012 and February 12, 2013

shootings were fired from the .40 caliber Glock handgun that was found inside the bedroom of Jones's father.

## 2. Jones's April 3, 2013 Police Interview

On April 3, 2013, Detective White, along with Los Angeles County Sheriff's Detective Gene Takashima, conducted an audio recorded interview of Jones. In the interview, Jones admitted that he was from the "11 Deuce" set of the Hoover gang, and that he got into the gang because his father was a member. Although Detective White did not have the results of the ballistics testing at the time, he told Jones that a gun recovered from his father's home "came back to a few shootings," and Jones' father did not match the description of the shooter. Detective White also told Jones that it "would look bad" for his father to go to prison for "something he didn't do." Jones initially denied any involvement in the shootings. When Detective White falsely stated that Jones's fingerprints had been found on the gun, Jones said that he sometimes held the gun, but "everybody did" as well. Jones also stated that the gun did not belong to his father, but rather was a "Hoover" gun.

While questioning Jones about his role in the shootings, Detective White showed him two fake photo arrays with Jones's photograph circled and handwritten statements indicating that he was the shooter in each incident. Detective White also suggested that he had spoken to people in the gang who had implicated Jones in the shootings, and told Jones that if he was proud to be a Hoover gang member, he should "stand up" and admit what he had done. Jones continued to deny that he was involved in the crimes. Upon further questioning, however, Jones admitted that he would give the gun from his father's apartment to his fellow gang members and that they would return it. Jones

also admitted that he was present at the scene of both shootings, but maintained that he was not the shooter.

With respect to the November 21, 2012 shooting, Jones told the detectives that he was with a group of Hoover gang members who were gathered outside the apartment building. Jones had given the gun to a fellow gang member at some point prior to the shooting, and that person was posted at the gate of the building to stand watch for the gang. When Smith and Strawn walked by that night, Jones and his group thought that they were rival gang members. Jones and some members of his group went outside the gate to "check the scene out," and the person standing watch with the gun began shooting at Smith and Strawn. Immediately after the shooting, Jones and the shooter ran to the apartment of Jones's father, and the shooter put back the gun. Jones said the shooter's name was "Melvin," but did not disclose any other information about him.

With respect to the February 12, 2013 shooting, Jones told the detectives that he had given the gun to two of his friends because they knew who his father was and had asked Jones for the gun. Prior to the shooting, Jones and his friends walked up the stairs of a house to confront someone that they thought might be a rival gang member. When that person said that he was not in a gang, Jones and his friends left him alone and walked back down the stairs. They then saw a red car driving by slowly and shouted out "11 Deuce Hoover" at the occupants in the car. Jones had already crossed the street when one of his friends suddenly began shooting at the car. After the shooting, Jones's friend gave him back the gun and Jones returned it to his father's home.

At one point during the interview, Detective White told Jones that he needed to "either clear your name or you go and

7

do a little time in camp for something you did or did not do."
When Jones asked how he could clear his name, Detective White
responded: "I'd rather the truth, to be honest with you. If you
did it, then be proud of it and do a little time in camp and move
on." Although Jones admitted at various times in the interview
that he was present at the shootings and supplied the gun that
was used in the crimes, he never admitted to being the shooter or
having any prior knowledge of the shooter's intent.

### D.     The June 15, 2013 Shooting [Count 5]

In count 5, Jones was charged with the murder of Joseph
Jordan. On June 15, 2013, at around 3:00 p.m., Jordan, who was
then 16 years old, was with his friends, Marshawn Kelly and
Lakia M., on Vermont Avenue near 112th Street. Jordan was
neither a gang member nor armed. While walking on Vermont
Avenue, Jordan and Kelly approached Jones, who was standing
near a market with his friend, Maurice J. Jordan confronted
Jones about a recent altercation that Jones had with Jordan's
sister at a party. Jones pulled a gun from his waistband when
confronted by Jordan, but put it back when Maurice told Jones
that he knew Jordan and was his friend. Jones then tried to
shake Jordan's hand. In response, however, Jordan hit Jones in
the face and the two men began a fistfight. At one point, Jordan
pushed Jones up against a fence. Jones then took the gun from
his waistband and fired multiple shots at Jordan, killing him.[2]

---

[2]     According to the medical examiner, Jordan sustained a
total of four gunshot wounds. The bullets struck Jordan's front
left thigh, front right thigh, back right shoulder, and left back.
The gunshot wounds to the thighs were consistent with Jordan
facing the shooter as two of the shots were fired. The gunshot
wounds to the shoulder and back were consistent with Jordan

8

Immediately after the shooting, Jones ran from the area. When the police arrived at the scene, Lakia provided them with a description of the shooter and said that his name was Tramel. Both Lakia and Kelly later identified Jones as the shooter in a photographic lineup. Lakia also identified Maurice as the person who was with Jones at the time of the shooting. In a subsequent interview with the police, Maurice indicated that, when Jordan pushed Jones against a fence during their fight, Jones fired a gun at Jordan, causing him to fall face down onto the ground. Jones then stood over Jordan's body and fired two more shots.[3]

### E. Police Investigation of the June 15, 2013 Shooting

### 1. Physical Evidence

On the night of the June 15, 2013 shooting, the police executed another search warrant at the apartment of Jones's father. There was a blood trail that led from an alley behind the apartment building to the unit where Jones's father lived. Inside the apartment, the police found blood on various items, including a red and white striped shirt. The police also learned that Jones had been treated at a hospital that same day for a gunshot wound to his left arm.

Five .45 caliber casings fired from the same semiautomatic handgun were recovered from the scene of the shooting; the gun

having his back to the shooter and possibly being on the ground as the other two shots were fired.

[3] At trial, Maurice denied that he knew Jones or Jordan, had witnessed the shooting, or had made any prior statements about the shooting to the police.

used in the shooting was never found. Surveillance video from a camera posted in the area showed Jordan hitting Jones during their fight, but did not capture the subsequent shooting.

## 2. Jones's June 17, 2013 Police Interview

On June 17, 2013, Los Angeles County Sheriff's Detectives Steve Rubino and Peter Hecht conducted an audio recorded interview with Jones. In the interview, Jones stated that, on the afternoon of June 15, 2013, his father sent him to the store to buy a soda. Jones was walking by himself on Vermont Avenue when he heard the sound of fireworks and saw people running from the area. Jones then looked at his arm and discovered that he had been shot. Jones ran back to his father's apartment and waited outside while his neighbor called for help. Jones denied that he was a Hoover gang member or that he was with anyone else when he was shot. Jones also denied that he went inside his father's apartment after the shooting or that he had been wearing the bloodstained clothing that was found in the apartment that same night. The detectives eventually decided to end the interview without discussing the details of the shooting because they believed that Jones was lying to them.

### F. Gang Expert Testimony

Los Angeles Sheriff's Detective Ernesto Castaneda testified as a gang expert for the prosecution. According to his testimony, the Hoover Criminals was a large criminal street gang with eight subsets, including the 11 Deuce Hoovers. In 2012 and 2013, there were approximately 100 members of the 11 Deuce Hoovers. The primary activities of the gang included vandalism, assaults, gun possession, robberies, and narcotics sales. The territory claimed by the gang included the area where the three shootings

10

in this case occurred. The November 21, 2012 shooting took place in front of an apartment building that was a known gang hangout for the 11 Deuce Hoovers.

Jones was a self-admitted member of the 11 Deuce Hoovers with visible gang tattoos on his shoulder, neck, and face. His monikers included "Killa Clock" and "Tiny Head." Maurice J., who was with Jones during the June 15, 2013 shooting, was also a Hoover gang member. None of the known victims of the three shootings were gang members; however, Jordan's sister was a member of the Raymond Crips, a rival of the Hoover Criminals. Detective Castaneda opined that Jones's father was a senior member of the Hoover Criminals, which placed him high in the hierarchy of the gang.

When presented with hypothetical questions based on the facts of this case, Detective Castaneda opined that each of the shootings would have been committed for the benefit of, and in association with, a criminal street gang. Detective Castaneda noted that each shooting occurred in the territory claimed by the gang and the shooter was accompanied by one or more members of his gang when he committed the crime. The shootings would benefit the gang by enhancing its reputation for violence and by instilling fear within the community and among rival gangs. Community residents would be afraid to report future gang-related crimes, which would allow the gang to continue pursuing its criminal activities.

## III. Verdict and Sentencing

With respect to the November 21, 2012 shooting, the jury found Jones guilty of the attempted willful, premeditated, and deliberate murders of Smith (count 1) and Strawn (count 2), and made true findings on the related firearm enhancements and

11

gang enhancements. With respect to the June 15, 2013 shooting, the jury found Jones guilty of the second degree murder of Jordan (count 5), and made a true finding on the related firearm enhancement, but found the gang enhancement to be not true. With respect to the February 12, 2013 shooting, the jury found Jones not guilty of the attempted murder of John Doe (count 3), and deadlocked on the charge of shooting at an occupied vehicle (count 4), after which a mistrial was declared as to that count.

Jones was sentenced to an aggregate term of 80 years to life in state prison. On count 1, the trial court imposed a term of 15 years to life for the attempted murder of Smith, plus 25 years to life on the firearm enhancement under section 12022.53, subdivisions (d) and (e). On count 2, the court imposed concurrent terms of 15 years to life for the attempted murder of Strawn and 20 years to life on the firearm enhancement under section 12022.53, subdivisions (c) and (e). On count 5, the court imposed a consecutive term of 15 years to life for the murder of Jordan, plus 25 years to life on the firearm enhancement under section 12022.53, subdivision (d). Jones appealed.

## DISCUSSION

### I.     The Denial of Jones's *Batson/Wheeler* Motions

Jones, who is African-American, challenges the trial court's denial of his two *Batson/Wheeler* motions. He contends that the prosecution violated his federal and state constitutional rights by exercising three of its peremptory challenges to excuse African-American prospective jurors.

## A. Relevant Proceedings

At the start of jury selection, a panel of 60 prospective jurors was sworn and 18 members of the panel were called to the jury box for voir dire. Prospective Juror No. 4131 was an African-American woman. She was divorced with one adult son. She worked for the United States Postal Service handling calls pertaining to missing mail. She previously had served on a jury in various cases, including a criminal case involving assault on a peace officer. One of the cases on which she served resulted in a hung jury. She indicated that serving on a hung jury did not cause her any frustration and that "everybody has their own opinion." Although she resided in an area with gangs, the presence of gangs did not affect her on a daily basis. She stated that she believed a person was innocent until proven guilty, and that she would make her decision based on the evidence. The prosecutor used her first peremptory challenge to excuse Prospective Juror No. 4131.

Six more prospective jurors were called into the jury box, including Prospective Juror No. 2372, a single African-American man with no children. He worked for Google as a field operator and had no prior jury experience. He stated that he had "no issues" with gangs, and could be fair to both sides. In response to a hypothetical question posed by the prosecutor, he indicated that the testimony of a single witness would not be sufficient for him to convict a defendant of a crime. Upon further inquiry, however, he agreed that he could follow a jury instruction which stated that one witness, if believed, was sufficient to prove any fact. The prosecutor used her sixth peremptory challenge to excuse Prospective Juror No. 2372.

13

Shortly thereafter, defense counsel made his first *Batson/Wheeler* motion, stating: "Last peremptory was a Black male. He's the young man that works for Google. He answered no questions that I thought would cause the People to want to kick him off. He works for a very prestigious company. The second juror excused was a Black female that lives in Inglewood. . . . She did not answer anything I thought that would cause the People to want to kick her off being she wasn't favorable about guns. I think between the two of those gives rise to a prima facie showing that Black jurors are systematically excluded especially in a Black case."

The trial court noted that the prospective jurors who had been excused by the prosecutor appeared to include one Black female, one Hispanic female, one Indian male, one White male, and one White female. The court also noted that there were other African-American prospective jurors in the panel seated in the courtroom. The court asked defense counsel to explain why he believed the prosecutor was systematically excluding African-Americans from the jury. Defense counsel responded: "Because we have so few African-Americans in -- I think especially the young Black man that works for Google. I didn't . . . see any reason he would not be a neutral juror in this case." The court found that there was no prima facie case of discrimination.

The court then asked the prosecutor if she wanted to state her reasons for the peremptory challenges for the record. The prosecutor first noted that there were two African-American prospective jurors remaining in the jury box. She then stated: "Juror No. 17 who is a young male Black I just excused is young, single, zero children, very similar to the juror I excused before that which was a female Hispanic, also single, no children. That

14

sort of lack of life experience is to me an unfavorable characteristic in a juror. It's not necessarily something I'll always exclude for, but particularly this early when I have peremptories, I do. They're not jurors I would choose to have on my jury." The prosecutor continued: "As to the Black female she was on a hung jury and thought nothing frustrating about that. So, that to me is a red flag. She could be a juror -- that type of juror that hangs the case." After confirming that the parties had no further argument on the matter, the trial court stated, "Okay. No finding of a prima facie showing."

Following the denial of the first *Batson/Wheeler* motion, additional prospective jurors were called into the jury box. The prosecutor exercised two more peremptory challenges and twice accepted the panel. Prospective Juror No. 7766 was an African-American woman. She was single and employed as an "eligibility worker." She previously had served on a jury in a criminal case involving domestic violence that reached a verdict. She stated that her younger brother was "a little special" and had been "arrested for just having, like, attention in public or something." She "was afraid of being assaulted and robbed," but had "never been scared to walk out of [her] house" and never had a problem with the gangs in her area. In describing how she felt upon hearing the charges and seeing the defendant in this case, she stated: "I was shocked like everyone else. Wow, that's many charges, but as far as his age or if anyone was sitting there, that's just, you know, a horrible situation, but, I mean, that was my natural emotion about it." She agreed that she could follow the rules in a criminal case and could vote for guilt if the prosecutor proved the case beyond a reasonable doubt. The prosecutor

exercised her ninth peremptory challenge to excuse Prospective Juror No. 7766.

At that time, defense counsel made his second *Batson/Wheeler* motion, stating: "Juror 13 is a young Black female who lives in Baldwin Hills. She works for D.P.S.S. She gave no indication that she would favor the defense. There's nobody in her family that are gang members. All I can see is that she perhaps she's young like the young Black male that was excluded who happened to work for Google, a very hard-[to]-get job and a very prestigious job, and I think that raises a prima facie case." The trial court asked the prosecutor if she wanted to respond. The prosecutor again noted that there were still two African-American prospective jurors in the jury box. She then stated: "As I indicated before, individuals who are young, unmarried, no children, lack a certain life experience I prefer jurors to have. She fits that criteria. She is a younger female who is single with no children." In response to defense counsel's claim that "young Black people" should be recognized as a "cognizable class," the prosecutor pointed out that she also had excused a young Hispanic female with no children and that she was not prohibited from excusing prospective jurors because they were young. The trial court agreed that youth and a lack of children were not protected categories, and noted that there were other African-American prospective jurors remaining on the panel. The court found that a prima facie case had not been made and denied the second *Batson/Wheeler* motion. Both parties then accepted the panel of 12 as constituted.

## B. Applicable Law

"Both the state and federal Constitutions prohibit the use of peremptory strikes to remove prospective jurors on the basis of group bias. (*Batson*, *supra*, 476 U.S. at p. 89; *Wheeler*, *supra*, 22 Cal.3d at pp. 276-277.)" (*People v. Scott* (2015) 61 Cal.4th 363, 383 (*Scott*).) "When a defendant asserts at trial that the prosecution's use of peremptory strikes violates the federal Constitution, the following procedures and standards apply. 'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citation.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide … whether the opponent of the strike has proved purposeful racial discrimination." [Citation.]' [Citations.] The identical three-step procedure applies when the challenge is brought under the California Constitution. [Citation.]" (*People v. Cowan* (2010) 50 Cal.4th 401, 447.)

"A prima facie case of racial discrimination in the use of peremptory challenges is established if the totality of the relevant facts gives "'rise to an inference of discriminatory purpose.'" [Citation.]" (*People v. Thomas* (2014) 53 Cal.4th 771, 793-794.) Among the "types of evidence [that] may prove particularly relevant" in evaluating whether a prima facie case of discrimination exists "are that a party has struck most or all of the members of the identified group from the venire, that a party has used a disproportionate number of strikes against the group, that the party has failed to engage these jurors in more than

17

desultory voir dire, that the defendant is a member of the identified group, and that the victim is a member of the group to which the majority of the remaining jurors belong.  [Citation.]  A court may also consider nondiscriminatory reasons for a peremptory challenge that are apparent from and 'clearly established' in the record [citations] and that necessarily dispel any inference of bias.  [Citations.]"  (*Scott, supra*, 61 Cal.4th at p. 384.)  Where "'a trial court denie[s] a [*Batson/Wheeler*] motion because it finds no prima facie case of group bias was established, the reviewing court considers the entire record of voir dire. [Citation.]  "If the record 'suggests grounds upon which the prosecutor might reasonably have challenged' the jurors in question, we affirm."'  [Citations.]"  (*People v. Panah* (2005) 35 Cal.4th 395, 439.)

Once a defendant establishes a prima facie case of discrimination, the burden shifts to the prosecutor to provide a non-discriminatory reason for exercising the peremptory challenge.  The prosecutor "'need only offer a genuine, reasonably specific, race-or group-neutral explanation related to the particular case being tried.  [Citations.]  The justification need not support a challenge for cause, and even a "trivial" reason, if genuine and neutral, will suffice.  [Citation.]'"  (*People v. Ervin* (2000) 22 Cal.4th 48, 74-75.)  "'We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges "'with great restraint.'"  [Citation.]  We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses.  [Citation.]  So long as the trial court makes a sincere and reasoned effort to evaluate the

nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.  [Citations.]'"  (*People v. Lenix* (2008) 44 Cal.4th 602, 613-614, fn. omitted.)

## C.    Jones's *Batson/Wheeler* Motions Were Properly Denied

Jones argues that the trial court erred in denying his two *Batson/Wheeler* motions because he made a prima facie showing that the prosecutor acted with a discriminatory intent in exercising her peremptory challenges.  He specifically asserts that the totality of the record was sufficient to support an inference of race discrimination in the prosecutor's use of peremptory challenges to remove three African-American prospective jurors from the panel.  We conclude the trial court properly concluded that Jones failed to demonstrate a prima face case of discrimination.

The record reflects that the prosecutor exercised three out of nine peremptory challenges to excuse African-American prospective jurors.  In making the first *Batson/Wheeler* motion, Jones's counsel contended that he had stated a prima facie case of race discrimination because the prosecutor had excused two African-Americans from the panel and there was no apparent reason for excluding the challenged jurors.  In making the second *Batson/Wheeler* motion, Jones's counsel similarly claimed that a prima facie showing had been made because the prosecution had now excused a third African-American from the panel and there was no indication the challenged juror would be favorable to the defense.  Jones's counsel urged the trial court to find that the prosecution's use of peremptory challenges showed a pattern of "systematically excluding" African-American prospective jurors

on the basis of their race.  While it is true that "[t]he exclusion by peremptory challenge of a single juror on the basis of race or ethnicity is an error of constitutional magnitude requiring reversal" (*People v. Silva* (2001) 25 Cal.4th 345, 386), the prima face showing is not made merely by establishing that an excluded juror was a member of a cognizable group.  (*People v. Howard* (2008) 42 Cal.4th 1000, 1018; *People v. Bonilla* (2007) 41 Cal.4th 313, 343.)  Rather, "'in drawing an inference of discrimination from the fact one party has excused "most or all" members of a cognizable group [citation], a court finding a prima facie case is necessarily relying on an apparent pattern in the party's challenges.' [Citation.]  Such a pattern will be difficult to discern when the number of challenges is extremely small." (*People v. Bonilla*, *supra*, at p. 343, fn. 12; see also *People v. Garcia* (2011) 52 Cal.4th 706, 747 ["[w]hile no prospective juror may be struck on improper grounds, we have found it "'impossible,'" as a practical matter, to draw the requisite inference where only a few members of a cognizable group have been excused"].)

In *People v. Farnam* (2002) 28 Cal.4th 107, for instance, the defendant sought to establish a prima facie case on the ground that four of the first five peremptory challenges exercised by the prosecution were against African-American prospective jurors and a very small minority of jurors on the panel were African-American.  (*Id*. at p. 136.)  The Supreme Court concluded that the statistical disparities cited by the defendant "fall short of a prima facie showing." (*Id*. at p. 137.)  Similarly, in *People v. Hoyos* (2007) 41 Cal.4th 872, disapproved on other grounds in *People v. Black* (2014) 58 Cal.4th 912, 920, the defendant claimed that the prosecution's use of peremptory challenges to strike three of the only four Hispanics on the panel was sufficient to demonstrate a

prima facie case. (*Id.* at p. 901.) The Supreme Court rejected that argument, reasoning that "although a prosecutor's excusal of all members of a particular group may establish a prima facie discrimination case, especially if the defendant belongs to the same group, this fact alone is not conclusive." (*Ibid.*; see also *People v. Lancaster* (2007) 41 Cal.4th 50, 76 [trial court properly found that prosecution's excusal of three of seven African-American female jurors "had not reached a level that suggested an inference of discrimination"]; *People v. Young* (2005) 34 Cal.4th 1149, 1172, fn. 7 [defendant failed to make a prima facie showing based on prosecution's excusal of three African-American female jurors because "[n]othing in *Wheeler* suggests that the removal of all members of a cognizable group, standing alone, is dispositive on the question of whether defendant has established a prima facie case"].) In this case, the prosecutor's use of three of nine peremptory challenges to excuse African-American prospective jurors was insufficient, standing alone, to establish a prima face case of race discrimination.

On appeal, Jones argues that he also made a prima facie showing of discrimination because the record established that the prosecutor lacked legitimate, race-neutral reasons for excusing the challenged jurors. The facts, on which he relies, however, are not at issue in determining whether a prima facie case was shown. Moreover, even if a prima facie case had been shown, Jones failed to establish error.

With respect to Prospective Juror No. 4131, the prosecutor explained that she had excused the juror based on her prior experience serving on a hung jury and statement that such result not cause her any frustration. As Jones acknowledges, prior service on a hung jury can be a legitimate, non-discriminatory

21

reason for a peremptory challenge. (*People v. Manibusan* (2013) 58 Cal.4th 40, 78 ["circumstance that a prospective juror has previously sat on a hung jury is a legitimate, race-neutral . . . reason for exercising a strike"]; *People v. Farnam*, *supra*, 28 Cal.4th at p. 138 [prior service on a hung jury "'constitutes a legitimate concern for the prosecution, which seeks a jury that can reach a unanimous verdict'"].) Jones nonetheless asserts that the prosecutor's stated reason was pretextual because she failed to ask follow-up questions to ascertain whether the case resulting in a hung jury was civil or criminal, or precisely why the prospective juror was not frustrated by the result. However, there is no requirement that a prosecutor ask a prospective juror a minimum number of questions before deciding whether to accept or excuse the juror. Nor is there any requirement that the prosecutor exercise a peremptory challenge solely on the basis of the specific responses elicited in voir dire. As our Supreme Court has recognized, "[a] prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons." (*People v. Lenix, supra*, 44 Cal.4th at p. 613.) Indeed, a peremptory challenge may be based on "no more than a 'hunch' about the prospective juror [citation], so long as it shows that the peremptory challenges were exercised for reasons other than impermissible group bias." (*People v. Williams* (1997) 16 Cal.4th 635, 664.)

With respect to Prospective Juror Nos. 2372 and 7766, the prosecutor explained that she had excused both jurors because they were young, single, and did not have children, which reflected a lack a life experience. As the Supreme Court has observed, a prospective juror's youth and corresponding lack of life experience can be a valid race-neutral reason for exercising a

22

peremptory challenge. (*People v. Lomax* (2010) 49 Cal.4th 530, 575 ["[a] potential juror's youth and apparent immaturity are race-neutral reasons that can support a peremptory challenge"]; *People v. Taylor* (2010) 48 Cal.4th 574, 616 [record disclosed race-neutral reasons for striking prospective juror where "she was single and very young, and had not registered to vote"]; *People v. Salcido* (2008) 44 Cal.4th 93, 140 [prospective juror's "relative youth and related immaturity were reasonable grounds for her excusal"].) Jones points out that both prospective jurors had full-time jobs notwithstanding their youth, with Prospective Juror No. 2372 working as a Google field operator and Prospective Juror No. 7766 employed as an eligibility worker. However, the prosecutor never indicated that she was basing her peremptory challenges on the prospective jurors' lack of employment. Rather, she referred to their youth and marital status, which she believed reflected a certain lack of life experience and was an unfavorable characteristic in a juror. While Jones disputes whether these prospective jurors actually lacked relevant life experience based on their responses in voir dire, "[a]ll that matters is that the prosecutor's reason for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory." (*People v. Reynoso* (2003) 31 Cal.4th 903, 924.) Here, the prosecutor's proffered reasons for excusing the prospective jurors were neither discriminatory on their face, nor sufficient to support an inference of purposeful discrimination.[4]

---

[4]     With respect to Prospective Juror No. 7766, Jones notes that the prosecutor's statement to the trial court that the juror had no children was not supported by the record. It is true that Prospective Juror No. 7766 never specifically stated in voir dire whether she had children. However, the prosecutor reasonably

Other circumstances appearing in the record support the trial court's conclusion that Jones failed to make a prima facie showing of discrimination. In particular, the record shows that the prosecutor twice accepted a panel that included two African-American prospective jurors, and that these individuals were ultimately seated on the jury. (*People v. Lenix, supra*, 44 Cal.4th at p. 629 ["prosecutor's acceptance of the panel containing a Black juror strongly suggests that race was not a motive in his challenge"]; *People v. Gray* (2005) 37 Cal.4th 168, 187-188 ["the exclusion of two African-American jurors and the retention of two failed to raise an inference of racial discrimination"].) The record further reflects that the victims of the shootings as well as the civilian witnesses who testified at trial were African-American, and thus, in the same protected class as Jones and the challenged prospective jurors. (*People v. DeHoyos* (2013) 57 Cal.4th 79, 115

---

may have inferred that the juror did not have children given that she was young and single, and did not mention any children in responding to the trial court's standard voir dire questions. Yet even assuming that the prosecutor was mistaken in her belief, "[t]he purpose of a hearing on a *Wheeler/Batson* motion is not to test the prosecutor's memory but to determine whether the reasons given are genuine and race neutral. "Faulty memory . . . that might engender a "mistake" of the type the prosecutor proffered to explain [a] peremptory challenge are not necessarily associated with impermissible reliance on presumed group bias." [Citation.] [An] 'isolated mistake or misstatement' [citation] does not alone compel the conclusion that this reason was not sincere." (*People v. Jones* (2011) 51 Cal.4th 346, 366.) When the totality of the record is considered, the prosecutor's statement that Prospective Juror No. 7766 lacked life experience as a "younger female who is single with no children" did not give rise to an inference of discriminatory purpose.

[where the defendant and the victim were of the same ethnicity, "it was unlikely the prosecutor would be concerned about minorities unduly identifying with the defendant"]; *People v. Cleveland* (2004) 32 Cal.4th 704, 733 [circumstance that both defendants and victim were of the same race as challenged jurors supported finding of no prima facie case of race discrimination].)

In sum, the totality of relevant facts dispels any inference of a discriminatory intent on the part of the prosecutor in exercising her peremptory challenges to excuse three African-American prospective jurors.  Because Jones failed to establish a prima facie case of race discrimination, the trial court did not err in denying his *Batson/Wheeler* motions.

## II.    The Admission of Jones's April 3, 2013 Statement to the Police

Jones also contends that the trial court violated his Fifth Amendment right against self-incrimination and his Fourteenth Amendment right to due process by admitting into evidence his April 3, 2013 statement to the police.  Jones argues that his statement should have been excluded at trial because it was involuntary and the result of coercive police conduct.

### A.    Relevant Proceedings

Prior to trial, defense counsel moved to suppress Jones's April 3, 2013 statement to Detectives White and Takashima in which he admitted his involvement in the November 21, 2012 and February 12, 2013 shootings.  Among other arguments, defense counsel asserted that Jones's statement was involuntary due to deceptive and coercive tactics by the police.  In particular, defense counsel claimed that the detectives repeatedly had lied to Jones during the interview by telling him that the casings

25

recovered from the shootings had been matched to the gun seized from his father's apartment, that Jones's fingerprints had been found on the gun, and that multiple witnesses had identified Jones as the shooter. Defense counsel also contended that the detectives had coerced Jones into an involuntary confession by threatening that his father could be charged with the crimes, and by making an express promise of leniency when they encouraged Jones to "man up" and "do a little time in [a juvenile] camp."

In response to Jones's motion to suppress, the prosecutor argued that ruses by the police were permissible. The prosecutor also asserted that the detectives never made an express promise of leniency to Jones, and even if any such promise was implied, it was not a motivating factor in Jones's statements about his involvement in the shootings. The prosecutor noted that Jones minimized his role and maintained that he was not the shooter throughout the interview, and that his "tenor and attitude" never changed. The prosecutor contended that, when the totality of the interview was considered, there was no indication that the detectives coerced Jones into making an involuntary confession.

The trial court listened to the full audio recording of the interview and reviewed the transcript of the recording. The court thereafter noted: "Having listened to the recording freshly within the last 15 to 20 minutes, . . . I didn't hear any threatening tone or any coercive language being used. . . . It seemed to be a very cooperative sort of conversation." At defense counsel's request, however, the court deferred ruling on the motion to suppress pending an evidentiary hearing.

Detective Takashima testified at the hearing the following day. He was the investigating officer for an unrelated robbery case in which Jones was a suspect. At the time of Jones's

26

interview, Detective Takashima was aware that Detective White was the investigating officer for two attempted murder cases and that Jones was also a suspect in those cases. At Detective Takashima's request, Jones was taken out of school on April 3, 2013, and transported to the police station. The interview was conducted in the afternoon and Jones was not handcuffed. At the start of the interview, Detective Takashima advised Jones of his *Miranda*[5] rights. He then interviewed Jones about the robbery. After Detective Takashima finished his questions, Detective White interviewed Jones about the two shootings. Jones was 16-years-old at the time of the interview and had prior arrests for battery, grand theft, unlawful taking of a vehicle, and marijuana possession.

Following Detective Takashima's testimony, the prosecutor advised the trial court that, when Detective White interviewed Jones, he utilized three specific ruses: (1) he showed Jones two fake six-pack lineups with Jones's photograph circled; (2) he told Jones that the ballistics evidence from the two shootings matched the gun found in his father's home (which was true but unknown to Detective White at the time); and (3) he told Jones that his fingerprints were found on the gun. The prosecutor reiterated that the police were allowed to use ruses when questioning a suspect. Defense counsel, on the other hand, asserted that such tactics should be subject to higher scrutiny when a juvenile suspect was involved. Defense counsel also argued that Detective White had used these various ruses, including a false promise of serving time in a juvenile camp, because a confidential informant had told him that Jones was the shooter, and Detective White

---

[5] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

27

knew that he did not have the evidence to prove that allegation unless he elicited a confession from Jones.

After further argument by counsel, the trial court stated: "Okay. So, I've looked at the totality of the discussion. I've considered the cases that were provided to me. I've listened to the recordings, the beginning of the recordings several times and the entire recording once along with the transcript, and I have also taken into consideration the nature of the discussion about possible camp and the progression of the conversation before and after that statement, and it does not appear to me there was anything improper about the questioning that coerced the response." The court therefore denied the motion to suppress. At trial, the audio recording and transcript of Jones's April 3, 2013 statement to the police were admitted into evidence.

### B. Applicable Law

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself. . . ." (U.S. Const., 5th Amend.) In *Miranda, supra,* 384 U.S. 436, the United States Supreme Court "'adopted a set of prophylactic measures to protect a suspect's Fifth Amendment right from the "inherently compelling pressures" of custodial interrogation.' [Citation.]" (*People v. Linton* (2013) 56 Cal.4th 1146, 1171.) Under *Miranda* and its progeny, "'a suspect [may] not be subjected to custodial interrogation unless he or she knowingly and intelligently has waived the right to remain silent, to the presence of an attorney, and, if indigent, to appointed counsel.'" (*People v. Dykes* (2009) 46 Cal.4th 731, 751.) To be valid, a *Miranda* "waiver must be 'voluntary in the sense that it was the product of a free and

28

deliberate choice rather than intimidation, coercion, or deception'
[citation], and knowing in the sense that it was 'made with a full
awareness of both the nature of the right being abandoned and
the consequences of the decision to abandon it.' [Citation.]"
(*People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 219.)

Juveniles, like adults, may validly waive their *Miranda*
rights. (See *People v. Nelson* (2012) 53 Cal.4th 367, 375 [15-year-
old waived *Miranda* rights]; *People v. Lessie* (2010) 47 Cal.4th
1152, 1169 [16-year-old waived *Miranda* rights]; *People v. Lewis*
(2001) 26 Cal.4th 334, 384 [13-year-old waived *Miranda* rights].)
"Determining the validity of a *Miranda* rights waiver requires 'an
evaluation of the defendant's state of mind' [citation] and 'inquiry
into all the circumstances surrounding the interrogation'
[citation]. When a juvenile's waiver is at issue, consideration
must be given to factors such as 'the juvenile's age, experience,
education, background, and intelligence, and . . . whether he has
the capacity to understand the warnings given him, the nature of
his Fifth Amendment rights, and the consequences of waiving
those rights.' [Citations.]" (*People v. Nelson*, *supra*, at p. 375; see
also *J. D. B. v. North Carolina* (2011) 564 U.S. ___, ___ [131 S.Ct.
2394, 2406] [age of child subject to police questioning is relevant
to the objective nature of the *Miranda* custody analysis].) In
reviewing the validity of a *Miranda* waiver, "we accept the
trial court's determination of disputed facts if supported by
substantial evidence, but we independently decide whether the
challenged statements were obtained in violation of *Miranda*.'
[Citation.]" (*People v. Hensley* (2014) 59 Cal.4th 788, 809.)

In addition, "'[t]he due process clause of the Fourteenth
Amendment precludes the admission of any involuntary
statement obtained from a criminal suspect through state

compulsion.' [Citation.]" (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1086.) "''A statement is involuntary if it is not the product of "'a rational intellect and free will.'" [Citation.] The test for determining whether a confession is voluntary is whether the defendant's 'will was overborne at the time he confessed.''" [Citations.] [¶] "'A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence. [Citation.] Although coercive police activity is a necessary predicate to establish an involuntary confession, it 'does not itself compel a finding that a resulting confession is involuntary.' [Citation.] The statement and the inducement must be causally linked. [Citation.]" [Citation].' [Citation.] A confession is not rendered involuntary by coercive police activity that is not the 'motivating cause' of the defendant's confession." (*People v. Linton*, *supra*, 56 Cal.4th at p. 1176.)

When a juvenile's confession is involved, "courts must use "'special care in scrutinizing the record'" to evaluate a claim that a juvenile's custodial confession was not voluntarily given. [Citation.]" (*People v. Nelson*, *supra*, 53 Cal.4th at p. 379.) The "court must look at the totality of circumstances, including the minor's age, intelligence, education, experience, and capacity to understand the meaning and consequences of the given statement." (*People v. Lewis, supra*, 26 Cal.4th at p. 383.) Therefore, "[e]ven when a juvenile has made a valid waiver of the *Miranda* rights, a court may consider whether the juvenile gave a confession after being "'exposed to any form of coercion, threats, or promises of any kind, [or] trickery or intimidation. . . .'" [Citation.] The constitutional safeguard of voluntariness ensures that any custodial admission flows from the volition

30

of the juvenile, and not the will of the interrogating officers." (*People v. Nelson*, *supra*, at p. 379, fns. omitted.)

"The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made. [Citation.]" (*People v. Carrington* (2009) 47 Cal.4th 145, 169.) "'"On appeal, the trial court's findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence, but the trial court's finding as to the voluntariness of the confession is subject to independent review."' [Citation.]' [Citation.] "'[W]hen a reviewing court considers a claim that a confession has been improperly coerced, if the evidence conflicts, the version most favorable to the People must be relied upon if supported by the record. [Citations.]'" [Citation.]" (*People v. Tully* (2012) 54 Cal.4th 952, 993.)

### C. Jones's April 3, 3013 Statement to the Police Was Properly Admitted

Jones argues that the trial court prejudicially erred in denying his motion to suppress his April 3, 2013 statement to the police. Jones specifically asserts that he did not voluntarily, knowingly, and intelligently confess to his culpability in the November 21, 2012 and February 12, 2013 shootings due to his age and the detectives' use of coercive tactics, including threats, deception, and promises of leniency. We conclude the trial court did not err in admitting Jones's statement because the totality of circumstances surrounding the interview demonstrates that Jones's waiver of his *Miranda* rights and subsequent admissions about his involvement in the shootings were voluntary.

31

### 1.    Jones Validly Waived His *Miranda* Rights

The totality of the circumstances shows that Jones made a knowing and voluntary waiver of his *Miranda* rights.  At the start of the interview, Detective Takashima advised Jones of his *Miranda* rights and Jones acknowledged that he understood those rights.[6]  Detectives White and Takashima then began questioning Jones about his membership in a gang and involvement in the shootings, and Jones answered the detectives' questions.  Nothing in the record indicates that Jones did not understand his *Miranda* rights or the consequences of waiving those rights.  He was 16-years-old at the time of the interview, was attending high school, and had prior arrests for battery, grand theft, and other offenses.  The content of the interview reflects that Jones was able to understand the detectives' questions and to provide coherent responses to those questions.  While Jones did not expressly waive his *Miranda* rights during the interview, he did so implicitly by voluntarily answering the detectives' questions after acknowledging that he understood those rights.  (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 384 ["[w]here the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right

---

[6]    The record reflects that the audio recording of the interview began as Detective Takashima was in the process of advising Jones of his *Miranda* rights, and as a result, the recording did not capture the complete *Miranda* advisement that was given.  However, Detective Takashima testified at the pre-trial hearing that he advised Jones of each of his *Miranda* rights at the start of the interview, and Jones does not contend on appeal that any portion of the *Miranda* advisement was not actually given.

32

to remain silent"]; *People v. Nelson, supra*, 53 Cal.4th at p. 379 [juvenile implicitly waived his *Miranda* rights "by willingly answering questions after acknowledging that he understood those rights"].) Jones's *Miranda* waiver was accordingly valid.

## 2. Jones's Post-*Miranda* Statement to the Police Was Voluntary

The totality of circumstances surrounding the interview also shows that Jones's incriminating statements to the police about his involvement in the November 21, 2012 and February 12, 2013 shootings were voluntary. The interview took place in the afternoon; Jones was never handcuffed during the interview, which lasted one hour and 10 minutes. As the trial court observed, the detectives were never aggressive with Jones, and Jones never appeared to be afraid while answering the detectives' questions. Rather, they engaged in a back-and-forth conversation during which the detectives expressed their belief that Jones was the shooter and Jones consistently denied that allegation. In response to the detectives' questions, Jones initially claimed that he had no knowledge of the shootings. He later admitted that he was present at the scenes of both incidents, but denied any other involvement. After further questioning, Jones admitted that he gave the gun used in the shootings to his fellow gang members at their request and then helped them return the gun to his father's home after the shootings occurred. However, throughout the interview, Jones steadfastly maintained that he was not the shooter and had no prior knowledge of the shooter's intent.

Jones contends that his incriminating statements about his role in the shootings were involuntary because they were the result of coercive police tactics. In particular, Jones claims that

33

Detective White improperly induced his confession by promising Jones that he would only "do a little time in camp" if he admitted his involvement in the shootings.  It is true that "'a confession is involuntary and therefore inadmissible if it was elicited by any promise of benefit or leniency whether express or implied.  [Citations.]  However, mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary. . . .' [Citation.]"  (*People v. Holloway* (2004) 33 Cal.4th 96, 115.)  Moreover, even when there is an express or implied promise of leniency, a subsequent admission by a suspect is not involuntary unless the promise "was the motivating cause of the decision to speak."  (*People v. McCurdy*, *supra*, 59 Cal.4th at p. 1088; see also *People v. Tully*, *supra*, 54 Cal.4th at p. 986 [promise of leniency renders a resulting statement involuntary "'if and only if inducement and statement are linked . . . by "proximate" causation'"].)

The record reflects that Detective White made the reference about Jones possibly serving time in a juvenile camp on page 38 of the 60-page interview transcript.  Detective White specifically told Jones:  "[H]ow can a clear your name?  Because I need to clear it.  Either I charge you with it or I clear it.  So here we are, this is probably my last chance I get to talk to you.  All right, I either clear your name or you go and do a little time in camp for something you did or did not do.  I need to know."  When Jones responded by asking how he could "clear [his] name," Detective White stated:  "I'd rather the truth, to be honest with you.  If you did it, then be proud of it and do a little time in camp and move on."  This brief and isolated exchange was the only time in the

34

interview that Jones's possible punishment for his involvement in the shootings was mentioned.

On appeal, Jones characterizes Detective White's statement about serving "a little time in camp" as an express promise of leniency. Even assuming that the statement is properly construed as an implied promise of leniency, the record does not support a finding that such promise proximately caused Jones's confession. At the time Detective White made the challenged statement, Jones already had admitted to being present at both the November 21, 2012 and February 12, 2013 shootings. Jones also had admitted that the gun found in his father's home was a "Hoover" gun, and that he would give the gun to his fellow gang members who would then return it. Immediately after Detective White made the comment about serving "a little time in camp," Jones actually retracted his prior statements about his role in the shootings, and claimed that he never witnessed the incidents but merely "heard the shots" because he happened to be on the same street. When Detective White pointed out the inconsistency, Jones continued to minimize his involvement in the shootings. Detective White then focused his questions on the details of the shootings and how the shooter came into possession of the gun. In the course of that discussion, Jones admitted that he had given the gun to his fellow gang members prior to the shootings and then helped them put the gun back in his father's home after the shootings occurred. However, during that discussion, neither Jones nor the detectives made any reference to juvenile camp time or any type of punishment that Jones might receive based on his role in the shootings. Under these circumstances, we cannot say that Detective White's isolated comment about camp time and Jones's subsequent statements about his involvement in

35

the crimes were """"causally linked."""" (*People v. Linton, supra*, 56 Cal.4th at p. 1177.)

Jones asserts that the detectives also used other deceptive tactics, including threats against his father, to coerce Jones into confessing to his involvement in the shootings. Jones argues that the various ploys and threats used by the detectives were sufficient to overcome his will and undermine the voluntariness of his confession. However, "the use of deceptive comments does not necessarily render a statement involuntary. Deception does not undermine the voluntariness of a defendant's statements to the authorities unless the deception is ""of a type reasonably likely to procure an untrue statement."" [Citations.] "'The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable.'" [Citation.]" (*People v. Williams* (2010) 49 Cal.4th 405, 443; see also *People v. Farnam, supra*, 28 Cal.4th at p. 182 ["'[l]ies told by the police to a suspect . . . can affect the voluntariness of an ensuing confession, but they are not per se sufficient to make it involuntary'"].)

It is undisputed that, during the interview, Detective White made deceptive statements about the nature of the evidence that the police had linking Jones and his father to the shootings. In addition to showing Jones fake six-packs identifying him as the shooter, Detective White told Jones that the casings recovered from the shootings matched his father's gun (which was later proven to be true but was not known at the time) and that Jones's fingerprints had been found on the gun (which was not true). Detective White also told Jones that his father could "face some serious time" given that the gun had been found inside his home. While Jones characterizes Detectives White's statements

36

as an implicit threat to prosecute his father for the shootings if Jones did not confess, the record does not support this claim. The detectives made clear in the interview that they did not believe Jones's father was the shooter because he did not match the description given by the witnesses. The detectives also made clear that they believed Jones was the shooter based on their investigation, and that Jones should "step up to the plate and admit what [he] did." Although Detective White made reference to the potential criminal liability that Jones's father could face as the owner of the gun, he never threatened that Jones's father would be charged as the perpetrator unless Jones confessed.

The totality of the interview further demonstrates that the deceptive statements made by the detectives about the evidence did not have the effect of coercing Jones into an involuntary and unreliable confession. As the trial court observed, the detectives clearly believed that Jones was the shooter, and the various ruses they employed were aimed at eliciting his admission that he was the one who fired the gun. Despite these ruses, however, Jones consistently denied being the shooter. In the course of answering questions about the events immediately preceding the shootings, Jones did admit that he was present at the scene of each incident, and he later admitted that he supplied the gun used in the shootings to his fellow gang members. He also volunteered details about the circumstances of the shootings which showed that he was in fact present during the commission of the crimes. Nonetheless, when faced with the false evidence implicating him as the shooter, Jones maintained that any witnesses who may have identified him as the shooter were mistaken, and that even if his fingerprints were on the gun, he never fired it. Jones was also adamant that, when he gave the gun to his fellow gang

37

members, he had no prior knowledge of the shooter's intent. Given that Jones continued to minimize his role in the shootings throughout the interview, the record does not support his claim that the deceptive tactics used by the detectives resulted in an unreliable confession. (See, e.g., *People v. Richardson* (2008) 43 Cal.4th 959, 992-993 [false statements by police that witnesses saw defendant at scene of the crime did not render his statement involuntary]; *People v. Farnam, supra*, 28 Cal.4th at p. 182 [false statements by police that defendant's fingerprints were found on victim's wallet did not render his statement involuntary].)

When the totality of circumstances surrounding the April 3, 2013 interview is considered, it does not support a finding that Jones's admissions to the detectives about his involvement in the shootings were the result of coercive police tactics that overcame his will and rendered his statement involuntary. The trial court accordingly did not err in admitting the statement at trial.

## III.  Jones's Sentence of 80 Years to Life in State Prison

Jones argues that his sentence of 80 years to life in state prison violates his Eighth Amendment right against cruel and unusual punishment because it is the functional equivalent of life without parole (LWOP) for a juvenile offender. He also asserts that the trial court erred in failing to give proper consideration to the factors enunciated in *Miller v. Alabama* (2012) 576 U.S. ___ [132 S.Ct. 2455] (*Miller*) prior to imposing the sentence. We conclude Jones's constitutional challenge to his sentence is moot under *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*), but remand the matter to the trial court to determine under *Franklin* whether Jones is entitled to a hearing to present evidence relevant to his future youthful offender parole hearing.

## A.    Relevant Proceedings

On April 13, 2015, the trial court held the sentencing hearing.  Prior to the hearing, the prosecutor filed a sentencing memorandum in which she requested that consecutive terms be imposed on the three counts for which Jones had been found guilty because each count involved a different victim.  Under this computation, the total sentence would be 115 years to life.  Given the length of the proposed sentence and Jones's age at the time of the offenses, the prosecutor also requested that the trial court consider the factors set forth in *Miller* and state its consideration of those factors on the record.  In addressing the *Miller* factors in the memorandum, the prosecutor noted that, among other circumstances, Jones was almost 17 years old when he committed the murder of Jordan; Jones was an aider and abettor in the attempted murders of Smith and Strawn, but the sole perpetrator in the murder of Jordan; Jones committed the murder of Jordan after he was interrogated by the police about the attempted murders of Smith and Strawn; Jones's father was a gang member; Jones's fellow gang member, Maurice J., attempted to diffuse the conflict between Jones and Jordan before the murder; and Jones acquired new gang tattoos on his face while in custody and awaiting trial on his crimes.

At the sentencing hearing, defense counsel referred to Jones's age at the time of the crimes, and stated that for any sentence longer than 25 years to life, the "presumptive parole date" would arise after 25 years.  Defense counsel also noted that Jones was not the direct perpetrator in the attempted murders of Smith and Strawn.  Defense counsel asked the trial court to sentence Jones to a term of 40 years to life.  In response, the prosecutor reiterated her request that consecutive terms be

imposed on all three counts because they involved separate victims, and also asked the court to "do an analysis of the *Miller* factors," whether the sentence imposed was 40 years to life or 115 years to life.

In sentencing Jones to an aggregate term of 80 years to life, the trial court imposed a term of 40 years to life for the attempted murder of Smith (count 1), a concurrent term of 35 years to life for the attempted murder of Strawn (count 2), and a consecutive term of 40 years to life for the murder of Jordan (count 3). The court explained that it was imposing concurrent terms on the two attempted murder counts because they involved "essentially the same conduct," but a consecutive term on the murder count because it was a separate and distinct crime.

Following the trial court's pronouncement of the sentence, the prosecutor again asked the court to "make a finding on the record of its own or agree that the *Miller* factors as [she] set forth in [her] sentencing record were tak[en] into consideration." The trial court responded: "Right. And the court did go over those, and the court has taken those factors into consideration including but not limited to . . . his age at the time of the murder, his age at the time of the two attempts, the influence of his mother and father on aiding and abetting on counts 1 and 2, gang affiliation, the additional tattoos, the time between the attempts and the actual murder, and that . . . mutual friend [Maurice J.] attempted to calm the matter, and that didn't appear to have any effect on the ultimate outcome of the murder."

## B.    Applicable Law

In *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*), the United States Supreme Court held that sentencing a juvenile to

life in prison without the possibility of parole for a nonhomicide offense violates the Eighth Amendment's prohibition against cruel and unusual punishment.  (*Id*. at p. 82.)  In *Miller*, the United States Supreme Court, following *Graham*, held that a mandatory sentence of life imprisonment without the possibility of parole for a juvenile convicted of murder also violates the Eighth Amendment.  (*Miller*, *supra*, 567 U.S. at p. ___, 132 S.Ct. at pp. 2467-2468.)  The *Miller* court explained that a mandatory life sentence "precludes consideration of [the juvenile's] chronological age and its hallmark features – among them, immaturity, impetuosity, and failure to appreciate risks and consequences."  (*Id*. at p. 2468.)  Although the *Miller* court did not prohibit sentencing juvenile offenders convicted of murder to life imprisonment without the possibility of parole, it held that sentencing courts must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison."  (*Id*. at p. 2469.)

In *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*), the California Supreme Court held that *Graham* and *Miller* apply to juveniles who are sentenced to the "functional equivalent" of life without parole for a nonhomicide offense.  (*Id*. at p. 268.)  The Supreme Court thus held that "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment."  (*Ibid*.)  In *Franklin*, *supra*, 63 Cal.4th 261, the California Supreme Court held that *Graham* and *Miller* also apply to juveniles who are sentenced to the "functional equivalent" of life without parole for a homicide offense.  (*Id*. at p. 276.)  The Supreme Court accordingly held that

41

"a juvenile may not be sentenced to the functional equivalent of [life without parole] for a homicide offense without the protections outlined in *Miller*." (*Ibid.*)

## C.   Jones's Constitutional Challenge Is Moot

Here, Jones's claim that his sentence of 80 years to life violates the Eighth Amendment because it is the functional equivalent of life without parole has been rendered moot. In response to *Graham*, *Miller*, and *Caballero*, the Legislature enacted section 3051, effective January 1, 2014. Section 3051 states that "any prisoner who was under 23 years of age at the time of his or her controlling offense" shall be provided "[a] youth offender parole hearing . . . for the purpose of reviewing the [prisoner's] parole suitability . . . ." (§ 3051, subd. (a)(1).) "A person who was convicted of a controlling offense that was committed before the person had attained 23 years of age and for which the sentence is a life term of 25 years to life shall be eligible for release on parole by the board during his or her 25th year of incarceration at a youth offender parole hearing . . . ." (§ 3051, subd. (b)(3).) Section 4801 provides that the parole board "shall give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law." (§ 4801, subd. (c).)

In *Franklin*, *supra*, 63 Cal.4th 261, the California Supreme Court held that "sections 3051 and 4801[,] . . . enacted by the Legislature to bring juvenile sentencing in conformity with *Miller*, *Graham*, and *Caballero*," mooted a juvenile's claim that his sentence of 50 years to life was the functional equivalent of life without parole and thus unconstitutional. (*Id.* at p. 268.) The Supreme Court explained that, "[c]onsistent with

42

constitutional dictates, those statutes provide [the juvenile] with the possibility of release after 25 years of imprisonment [citation] and require the [parole board] to 'give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity.'" (*Ibid*.)  Because the enactment of the statutes meant that the juvenile was "now serving a life sentence that includes a meaningful opportunity for release during his 25th year of incarceration," his sentence "is neither LWOP nor its functional equivalent" and "no *Miller* claim arises."  (*Id.* at pp. 279-280.)

Like the juvenile offender in *Franklin*, Jones will be entitled to a youth offender parole hearing with a meaningful opportunity for release after 25 years of incarceration.  (§ 3051, subd. (b)(3).)  Therefore, pursuant to section 3051 and the holding in *Franklin*, Jones's sentence of 80 years to life in state prison is not the functional equivalent of life without parole, and his constitutional challenge to the sentence is moot.

### D.     A Limited Remand Under *Franklin* Is Proper

Although the Supreme Court in *Franklin* held that the juvenile offender "need not be resentenced," it remanded "the matter to the trial court for a determination of whether [the juvenile] was afforded sufficient opportunity to make a record of information relevant to his eventual youth offender parole hearing."  (*Franklin*, *supra*, 63 Cal.4th at p. 284.)  The Supreme Court also described the procedure to be followed on remand: "If the trial court determines that [the juvenile] did not have sufficient opportunity, then the court may receive submissions and, if appropriate, testimony pursuant to procedures set forth in section 1204 and rule 4.437 of the California Rules of Court, and

43

subject to the rules of evidence.  [The juvenile] may place on the record any documents, evaluations, or testimony (subject to cross-examination) that may be relevant at his eventual youth offender parole hearing, and the prosecution likewise may put on the record any evidence that demonstrates the juvenile offender's culpability or cognitive maturity, or otherwise bears on the influence of youth-related factors.  The goal of any such proceeding is to provide an opportunity for the parties to make an accurate record of the juvenile offender's characteristics and circumstances at the time of the offense so that the Board, years later, may properly discharge its obligation to 'give great weight to' youth-related factors [citation] in determining whether the offender is 'fit to rejoin society' despite having committed a serious crime 'while he was a child in the eyes of the law.' [Citation.]" (*Ibid.*)

Jones was sentenced after the enactment of sections 3051 and 4801, but prior to the decision in *Franklin*.  At the sentencing hearing, defense counsel did not present any evidence concerning Jones's level of maturity, cognitive ability, or other youth-related factors.  Defense counsel simply referred to Jones's age at the time of the offenses, and then noted that a juvenile offender sentenced to a term of 25 years to life would receive a parole hearing during his 25th year of incarceration.  Apart from this passing reference to Jones's future parole eligibility date, however, defense counsel made no attempt to place on the record any type of mitigating evidence that could be relevant at Jones's eventual youth offender parole hearing.  Rather, the focus of both the parties and the trial court at the sentencing hearing was on the length of the sentence, and specifically, whether consecutive or concurrent terms would be imposed.  It is true, as the Attorney

44

General asserts, that the prosecutor discussed the application of the *Miller* factors in her sentencing memorandum and asked the trial court to consider those factors on the record in sentencing Jones. However, neither party addressed the type of evidentiary record showing that would be required for Jones's youth offender parole hearing under sections 3051 and 4801; as the Supreme Court explained in *Franklin*, such a record is better made close in time to the offense "rather than decades later when memories have faded, records may have been lost or destroyed, or family or community members may have relocated or passed away." (*Franklin, supra,* 63 Cal.4th at p. 284.)

The Attorney General nevertheless argues that a remand is unnecessary because Jones had "the opportunity to present as much *Miller* evidence as he desired at sentencing," even if he did not avail himself of that opportunity. Prior to *Franklin*, however, there was no clear indication that a juvenile's sentencing hearing would be the primary mechanism for creating the record of information required for a youth offender parole hearing 25 years in the future. *Franklin* made clear that the sentencing hearing has newfound import in providing the juvenile with an opportunity to place on the record the kinds of information that "will be relevant to the [parole board] as it fulfills its statutory obligations under sections 3051 and 4801." (*Franklin, supra,* 63 Cal.4th at p. 287.)

In this pre-*Franklin* hearing, as a result, we cannot assume that Jones and his counsel anticipated the extent to which evidence of youth-related factors was a critical component of the sentencing hearing. We do not suggest that every juvenile offender sentenced prior to *Franklin* and eligible for a parole hearing under section 3051 is entitled to a remand to present

evidence regarding his or her youth-related characteristics and circumstances at the time of the offense. Rather, we conclude that, in this case, it is unclear whether Jones understood both the need and the opportunity to develop the type of record contemplated by *Franklin*. Accordingly, we remand the matter so that the trial court can follow the procedures outlined in *Franklin* to ensure that such opportunity is afforded to Jones.

## DISPOSITION

The judgment is affirmed. The matter is remanded to the trial court for a *Franklin* determination.


ZELON, J.


We concur:



PERLUSS, P. J.



SEGAL, J.