Filed 10/15/20 (review denied 1/27/21; reposted to include Supreme Court statement upon denial of review)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B294095 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA101415) |
| v. | |
| GIOVANNY MONTELONGO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gary J. Ferrari, Judge. Affirmed with directions.

Patricia A. Scott, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Acting Supervising Deputy Attorney General, and David A. Voet, Deputy Attorney General, for Plaintiff and Respondent.

# INTRODUCTION

When he was 18 years old, Giovanny Montelongo stabbed and killed 15-year-old Keshawn Brooks while trying to take Brooks's backpack and a bag containing football gear. A jury convicted Montelongo of robbery and felony murder with a special circumstance finding under Penal Code section 190.2, subdivision (a)(17), which mandates a sentence of death or life in prison without the possibility of parole. On the murder conviction, the trial court sentenced Montelongo to life in prison without the possibility of parole, plus one year for using a deadly or dangerous weapon. The trial court also imposed various fines and assessments, including a restitution fine of $10,000.

Montelongo challenges his sentence as violating the Due Process Clause of, and the Eighth and Fourteenth Amendments to, the United States Constitution. He argues that, as applied to him, the felony murder special circumstance statute is void for vagueness, that his sentence is cruel and unusual because the trial court failed to take his youth into account before sentencing him to prison for life without the possibility of parole for a crime he committed when he was 18 years old, and that the trial court failed to consider his ability to pay the fines and assessments the court imposed. Because none of Montelongo's arguments has merit, we affirm the judgment. We also direct the trial court to correct the minute order following the sentencing hearing and the abstract of judgment to strike the parole revocation fine.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Montelongo Kills Brooks*

On March 12, 2015 Brooks and Lance Coleman-Davis walked home together from school. They were both 15 years old. Brooks had two bags: a backpack containing his schoolwork and an equipment bag for football practice. Brooks and Coleman-Davis saw Montelongo down an alley. Montelongo made the shape of an "L" with his hand, which the boys knew was a gang sign for the Westside Longo street gang. Montelongo began jogging toward the boys and asked them where they were from. The boys said they did not "bang," meaning they were not gang members.

Montelongo reached for one of Brooks's bags, and Coleman-Davis pushed Montelongo away. Montelongo reached for the bag again and said "'Give me your bag,'" and Brooks punched him in the face. As Montelongo and Brooks struggled, Montelongo stabbed Brooks once in the chest with a six-inch knife. Brooks dropped his bags. Montelongo picked up one of the bags, said "Fuck Crabs,"[1] and walked back down the alley. Brooks collapsed near a barbershop, where a nurse tried to stop his bleeding with a towel while waiting for an ambulance. Brooks died at the hospital.

---

[1] "Crabs" is a disrespectful reference to the West Coast Crips, a criminal street gang with which Montelongo apparently believed Brooks was affiliated.

B.    *The Police Arrest Montelongo, and the People Charge Him with Robbery and Special Circumstance Murder*

A police officer arrived, questioned Coleman-Davis, and retrieved Brooks's backpack. Another officer found Brooks's equipment bag outside an apartment building near the end of the alley. Police found Montelongo in the backyard of a house nearby and arrested him.

The People charged Montelongo with robbery (Pen. Code, § 211)[2] and murder (§ 187, subd. (a)) and alleged the special circumstance that Montelongo committed murder during the commission of a robbery, within the meaning of section 190.2, subdivision (a)(17). As to both counts the People alleged Montelongo personally used a deadly or dangerous weapon (§ 12022, subd. (b)(1)) and committed the offenses for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members, within the meaning of section 186.22, subdivision (b).

C.    *A Jury Convicts Montelongo, and the Trial Court Sentences Him*

A jury convicted Montelongo on both counts and found true the allegations Montelongo committed murder while engaged in the commission of robbery, personally used a deadly or dangerous weapon, and committed the offenses for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members. The People asked the court to sentence Montelongo to life in prison without the possibility of parole, as

---

[2]    Undesignated statutory references are to the Penal Code.

4

required by section 190.2, subdivision (a)(17), plus an additional year for the weapon enhancement under section 12022, subdivision (b)(1).

Montelongo argued that, because he was 18 years old when he committed the crimes, a sentence of life without the possibility of parole was cruel and unusual punishment under the United States and California Constitutions and that he was not "irretrievably depraved." Montelongo acknowledged that the United States Supreme Court's decision in *Miller v. Alabama* (2012) 567 U.S. 460 [132 S.Ct. 2455] (*Miller*) prohibited mandatory sentences of life without the possibility of parole only for juvenile offenders under the age of 18. Nevertheless, he argued that "there has been a sea change in what is constitutionally acceptable in the sentencing of youth offenders" and that "the state of research and the need for corresponding action have changed rapidly." Citing scientific advancements in brain research, Montelongo urged the court to consider the factors mandated by *Miller* to determine whether his crimes reflected "'unfortunate yet transient immaturity'" or "'irreparable corruption'" before sentencing him to life without the possibility of parole. (See *id.* at pp. 477-480; *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1388-1389.)

With regard to the *Miller* factors, Montelongo described his upbringing and home environment as chaotic, abusive, and neglectful, and he argued the crimes he committed demonstrated impetuous acts of a teenager, not "extreme viciousness or incurable depravity." Montelongo also contended sentencing him to life without the possibility of parole violated his right to equal protection under the Fourteenth Amendment because section 3051 denied him a parole hearing after his 25th year of

imprisonment, while giving that benefit to other 18-year-old offenders.[3]

The trial court sentenced Montelongo on the murder conviction to a prison term of life without the possibility of parole, plus one year for the weapon enhancement.[4]  In response to Montelongo's argument that a sentence of life without the possibility of parole as applied to him violated the United States and California Constitutions, the court stated:  "I reviewed the *Miller* factors that you point out.  But with respect to that, I would like to say that a lot of people grow up in families that aren't perfect and they don't go around killing little 15-year-old kids."  On the robbery conviction, the court sentenced Montelongo to the middle term of three years, plus 10 years for the gang enhancement and one year for the weapon enhancement, execution of which the court stayed under section 654.

The court also ordered Montelongo to pay a $10,000 restitution fine (at $300 "per year") (§ 1202.4), a $40 court operations assessment (§ 1465.8, subd. (a)(1)), and a $30 court facilities assessment (Gov. Code, § 70373).  Montelongo did not object to the restitution fine or the assessments.  Although the

---

[3]     Section 3051 establishes special parole eligibility guidelines for young adult offenders up to age 25, but excludes a defendant "sentenced to life in prison without the possibility of parole for a controlling offense that was committed after the person had attained 18 years of age."  (§ 3051, subd. (h).)

[4]     At the sentencing hearing, the court stated it was imposing "an additional year for the firearm allegation," but the only weapon enhancement alleged in connection with the murder count was for personal use of a deadly or dangerous weapon (a "sharp instrument").

court did not mention a parole revocation fine at the sentencing hearing, the court's minute order and the abstract of judgment indicate the court also ordered Montelongo to pay a parole revocation fine of $10,000 (§ 1202.45), which the court stayed "unless parole, postrelease, community supervision or mandatory supervision is revoked." Montelongo timely appealed.

## DISCUSSION

A.  *The Felony Murder Special Circumstance Statute Is Not Unconstitutionally Vague as Applied to Montelongo*

Montelongo argues the "mode of culpability" established by sections 187, 189, and 190.2, subdivision (a)(17), is unconstitutionally vague under the Fourteenth Amendment to the United States Constitution because where, as here, intent to kill is not an element of murder, "there is no meaningful distinction between first degree felony murder based on robbery and the robbery-murder special circumstance." Montelongo's argument fails because two statutes that criminalize the same conduct but impose different penalties are not, for that reason, unconstitutionally vague.

1.  *Robbery Felony Murder vs. Robbery Murder Special Circumstance*

Section 187, subdivision (a), defines murder as "the unlawful killing of a human being . . . with malice aforethought." Section 189 defines first degree murder to include "willful, deliberate, and premeditated killing," as well as murder "committed in the perpetration of, or attempt to perpetrate,"

7

certain felonies, including robbery. (§ 189, subd. (a).) A killing in the latter circumstance need not be intentional, according to the felony murder doctrine, when the defendant is the actual killer. (See *People v. Gonzalez* (2012) 54 Cal.4th 643, 654 ["Felony murder liability does not require an intent to kill, or even implied malice, but merely an intent to commit the underlying felony."]; *People v. Superior Court (Ferraro)* (2020) 51 Cal.App.5th 896, 904 [same]; see also *People v. Chun* (2009) 45 Cal.4th 1172, 1184 ["'The felony-murder rule imputes the requisite malice for a murder conviction to those who commit a homicide during the perpetration of a felony inherently dangerous to human life.'"]; *People v. Johns* (2020) 50 Cal.App.5th 46, 57-58 ["The felony-murder rule made 'a killing while committing certain felonies murder without the necessity of further examining the defendant's mental state.'"].)[5] First degree murder is punishable by death, life without the possibility of parole, or 25 years to life (§ 190, subd. (a)), "with the penalty to be determined as provided in certain statutory provisions, including the felony-murder special-circumstance statute." (*People v. Andreasen* (2013) 214 Cal.App.4th 70, 80 (*Andreasen*).)

The special circumstance statute lists over two dozen circumstances in which the court must sentence a defendant

---

[5] Senate Bill No. 1437, effective January 1, 2019, added section 189, subdivision (e), which now limits liability for felony murder to a person who was (1) the actual killer; (2) not the actual killer but who, "with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree"; or (3) not the actual killer but who was a "major participant in the underlying felony and acted with reckless indifference to human life . . . ."

convicted of first degree murder to death or to life in prison without the possibility of parole.  (§ 190.2, subd. (a).)  These special circumstances include when the "murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit," certain felonies, including robbery.  (§ 190.2, subd. (a)(17); see *Andreasen*, *supra*, 214 Cal.App.4th at p. 80 ["Once the jury finds the defendant has committed first degree murder, the felony-murder special circumstance applies if the murder was committed during the commission or attempted commission of a statutorily enumerated felony, and subjects the defendant to a sentence of death or of life without the possibility of parole."].)

Under the applicable statutes, there is little semantic difference between felony murder based on robbery under section 189 (a killing "committed in the perpetration of . . . robbery") and the robbery murder special circumstance under section 190.2, subdivision (a)(17) (a killing "committed while the defendant was engaged in . . . the commission of" robbery).  But courts have fashioned a distinction between the two based on the legislative history of former section 190.2, which imposed the death penalty or life without the possibility of parole on the most serious offenders.  (See *People v. Green* (1980) 27 Cal.3d 1, 61-62 (*Green*), disapproved on another ground in *People v. Aldemat* (2019) 8 Cal.5th 1, 13; see also *People v. Kimble* (1988) 44 Cal.3d 480, 500-501.)  "[T]o find true a felony-murder special circumstance" under section 190.2, courts require the defendant to have had ""an independent purpose for the commission of the felony, that is, the commission of the felony was not merely incidental""" to the murder.  (*People v. Jackson* (2016) 1 Cal.5th

269, 345; accord, *People v. Brooks* (2017) 3 Cal.5th 1, 117-118; see *People v. Riccardi* (2012) 54 Cal.4th 758, 836 ["Pursuant to our decision in *People v. Green*, *supra*, 27 Cal.3d 1, a felony-murder special circumstance is inapplicable if the underlying felony is merely 'incidental' or 'ancillary' to the murder; instead, the evidence must demonstrate an independent or concurrent felonious purpose distinct from any intent to kill."], disapproved on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)[6]  This "independent felonious purpose rule" is not an

---

[6]    In *People v. Robertson* (1982) 33 Cal.3d 21 the Supreme Court explained:  "[W]e concluded [in *Green*] that the circumstances of that case did not constitute 'a murder in the commission of a robbery but the exact opposite, a robbery in the commission of a murder.'  [Citation.]  Recognizing that '[a]t the very least . . . the Legislature must have intended that each special circumstance provide a rational basis for distinguishing between those murderers who deserve to be considered for the death penalty and those who do not,' we concluded that such a goal 'is not achieved . . . when the defendant's intent is not to steal but to kill and the robbery is merely incidental to the murder . . . because its sole object is to facilitate or conceal the primary crime.'  [Citation.]  In holding that such an 'incidental' robbery would not provide a proper basis for a special circumstance finding, we specifically contrasted that case with one in which a defendant '[kills] in cold blood in order to advance an independent felonious purpose, e.g., . . . [carries] out an execution-style slaying of the victim of or witness to a holdup, kidnaping, or a rape.'" (*Robertson,* at p. 52.)  The version of section 190.2 at issue in *Green* reserved sentences of death and life without the possibility of parole for defendants who both intended to kill and intended to commit certain independent felonies, including robbery.  (See *Robertson*, at p. 48, fn. 14.)  In 1978 the voters added section 190.2 by initiative to make more defendants eligible for death and life without the possibility of

10

element of the crime, but instead "'merely clarifies the scope of the requirement that the murder must have taken place "during the commission" of a felony.'" (*Brooks*, at p. 117.) A court must instruct a jury, "on its own motion, that the felony cannot have been merely incidental to the murder when there is evidence from which the jury could have inferred that the defendant did not have an independent felonious purpose for committing the felony." (*Id.* at p. 118.) The trial court in this case instructed the jury on the independent felonious purpose rule.

> 2. *Montelongo Had Notice of the Conduct Proscribed by Section 190.2, and He Does Not Claim Discriminatory Prosecution*

"[A] penal statute must be drafted with sufficient clarity to give fair notice of what conduct is proscribed." (*People v. Brown* (2017) 14 Cal.App.5th 320, 336; see *Kolender v. Lawson* (1983) 461 U.S. 352, 357-358 [103 S.Ct. 1855] (*Kolender*) [a penal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement"]; *United States v. Batchelder* (1979) 442 U.S. 114, 123 [99 S.Ct. 2198] (*Batchelder*) ["[a]

---

parole, including defendants like Montelongo who intended to commit robbery but may not have intended to kill. (Former § 190.2, repealed and added by Prop. 7, as approved by voters, Gen. Elec. (Nov. 7, 1978).) Courts nevertheless continue to apply the interpretation of the version of section 190.2 in *Green* to the current version of the statute. (See, e.g., *People v. Riccardi*, *supra*, 54 Cal.4th at p. 836; see generally *People v. Anderson* (1987) 43 Cal.3d 1104, 1138-1148 [discussing the 1978 amendments to section 190.2].)

criminal statute is . . . invalid if it 'fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden'"].) The Constitution, however, does not prohibit two statutes from proscribing the same or similar conduct, so long as the defendant has notice of what conduct is prohibited and the prosecutor does not decide which statute to charge "for invidious reasons (e.g., race, gender, etc.)." (*Brown*, at pp. 339-340; see *Batchelder*, at pp. 123-124 ["This Court has long recognized that when an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants."].)

Montelongo does not argue that he did not have notice of what conduct would subject him to sentencing under section 190.2 or that the prosecutor decided to allege a special circumstance under section 190.2 based on Montelongo's race or gender or for some other "invidious" reason. Instead, Montelongo argues the felony murder statute and the felony murder special circumstance statute give prosecutors "an unconstitutional amount of power" to "pick the penalty—life with the possibility of parole, on one hand, or the finality of [life without the possibility of parole], on the other." Decisions by the United States Supreme Court and the California Supreme Court, however, foreclose this argument. (See *Batchelder*, *supra*, 442 U.S. at p. 123 [rejecting a vagueness challenge to statutes that overlapped in prohibiting felons from receiving firearms but authorized different maximum penalties]; *Davis v. Municipal Court* (1988) 46 Cal.3d 64, 88-89 [citing *Batchelder* to reject a challenge to rules giving the district attorney the authority to decide whether to charge a crime as a misdemeanor or a felony]; cf. *People v. Wilkinson* (2004) 33 Cal.4th 821, 834-835 [citing *Batchelder* to reject an equal

12

protection challenge to statutes allowing more severe punishment for battery on a custodial officer without injury than for battery on a custodial officer with injury]; *People v. Superior Court* (*Caswell*) (1988) 46 Cal.3d 381, 395 ["the Legislature may criminalize the same conduct in different ways"].)

Montelongo cites *Kolender*, *supra*, 461 U.S. 352 for the proposition that a statute that fails to describe with sufficient particularity what a suspect must do to fall within the statute "encourages arbitrary enforcement." (*Id.* at pp. 361-362.) *Kolender* involved a facial challenge to a single statute that required people "who loiter or wander on the streets to provide a 'credible and reliable' identification and to account for their presence when requested by a peace officer." (*Id.* at p. 353.) The United States Supreme Court held the statute was unconstitutionally vague because it did not contain sufficient standards to determine whether a suspect complied with the identification requirement, thus conferring on police "'a virtually unrestrained power to arrest and charge persons with a violation.'" (*Id.* at pp. 360-361.)

Montelongo does not identify any language in sections 189 or 190.2 that police officers or prosecutors can interpret at will and enforce against ""particular groups deemed to merit their displeasure."" (*Kolender*, *supra*, 461 U.S. at p. 360.) In fact, Montelongo faced prosecution under two statutes that clearly identified the conduct they proscribed, but subjected him to different penalties. These are the same circumstances the Supreme Court in *Batchelder* condoned: "The [two] provisions in issue here . . . unambiguously specify the activity proscribed and the penalties available upon conviction. . . . Although the statutes create uncertainty as to which crime may be charged

13

and therefore what penalties may be imposed, they do so to no greater extent than would a single statute authorizing various alternative punishments." (*Batchelder*, *supra*, 442 U.S. at p. 123.) "[T]here is no appreciable difference between the discretion a prosecutor exercises when deciding whether to charge under one of two statutes with different elements and the discretion he [or she] exercises when choosing one of two statutes with identical elements. In the former situation, once he [or she] determines that the proof will support conviction under either statute, his [or her] decision is indistinguishable from the one he [or she] faces in the latter context. The prosecutor may be influenced by the penalties available upon conviction, but this fact, standing alone, does not give rise to a violation of the Equal Protection or Due Process Clause." (*Id.* at p. 125; see *Andreasen*, *supra*, 214 Cal.App.4th at p. 80 ["The mere fact that the prosecution has discretion to select which punishment it will seek does not render a statute unconstitutionally vague or create an improper risk of arbitrary enforcement of a criminal statute."].)

The prosecutor in this case could have charged Montelongo with felony murder under section 189, pursuant to which Montelongo would have been eligible for a sentence that included the possibility of parole, but the prosecutor elected to allege a special circumstance under section 190.2. That the prosecutor had discretion to charge Montelongo under two statutes with different penalties does not render the statutory scheme unconstitutional. (See *People v. Brown*, *supra*, 14 Cal.App.5th at pp. 337-338 [human trafficking statute was not void for vagueness as applied to the defendant merely because the prosecutor could have charged the defendant with pandering, which provided a lesser penalty than human trafficking].)

Without addressing *Batchelder* or its progeny, Montelongo argues that, for the statutory scheme to "give notice and prevent arbitrary enforcement," the felony murder statute and the felony murder special circumstance statute must apply to distinct conduct. To support this argument, however, Montelongo cites cases that apply the standard for determining whether death penalty eligibility standards are unconstitutionally vague under the Eighth Amendment, not the Fourteenth Amendment. (See *People v. Combs* (2004) 34 Cal.4th 821, 868; *Morales v. Woodford* (9th Cir. 2004) 388 F.3d 1159, 1174-1175.)[7] For death penalty eligibility standards to satisfy the Eighth Amendment, they must provide "'a meaningful basis for distinguishing the few cases in which the penalty is imposed from the many cases in which it is not.'" (*Morales*, at p. 1174; see *Combs*, at p. 868 ["The lying-in-wait special circumstance adequately distinguishes between first degree murders that are death eligible and those that are not."].) The People did not seek the death penalty for Montelongo, and his vagueness challenge arises under the Fourteenth Amendment, not the Eighth Amendment. And even if the Eighth Amendment vagueness standard applied to Montelongo's challenge, in *People v. Winbush* (2017) 2 Cal.5th 402 the Supreme Court held that the robbery special circumstance statute is not unconstitutionally vague under the Eighth Amendment. (*Id.* at p. 488.)

Two other cases Montelongo cites, *People v. Superior Court (Bradway)* (2003) 105 Cal.App.4th 297 and *Houston v. Roe* (9th Cir. 1999) 177 F.3d 901, applied the vagueness standard under

---

[7] Montelongo nevertheless acknowledges that the standards for vagueness under the Eighth and Fourteenth Amendments are different.

the Fourteenth Amendment, but held the lying-in-wait special circumstance statute (§ 190.2, subd. (a)(15)) is not unconstitutionally vague.  (See *Bradway*, at p. 309; *Houston*, at pp. 907-908.)  Although these cases acknowledged the lying-in-wait special circumstance statute is distinct from the lying-in-wait felony murder statute, they do not stand for the proposition that due process requires any such distinction.  Instead, both cases repeat the standard established in *Kolender* and *Batchelder* that due process challenges "'rest[ ] on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk.'" (*Bradway*, at p. 309; see *Houston*, at p. 907.)

Finally, Montelongo argues the court in *Andreasen, supra*, 214 Cal.App.4th 70 wrongly held the robbery murder special circumstance statute was not unconstitutionally vague on the ground it is not sufficiently distinct from the robbery felony murder statute.  (See *id.* at pp. 80-81.)  According to Montelongo, had the court in *Andreasen* applied the law correctly, it would have concluded the statutes are identical and therefore unconstitutionally vague.  But the court in *Andreasen* first rejected the defendant's constitutional challenge to the robbery murder special circumstance statute under *Batchelder*, just as we do here, and only in the alternative addressed whether sections 189 and 190.2 were sufficiently distinct.  (See *Andreasen*, at p. 80 ["even assuming arguendo that constitutional due process requires a distinction between the felony-murder offense and the felony-murder special circumstance, . . . there is such a distinction"].)  Thus, even if the court in *Andreasen* reached the wrong conclusion on that point, an issue we need not address, it would not have changed the outcome of that case.

16

B.    *Montelongo's Sentence Is Not Cruel and Unusual Under the Eighth Amendment*

Montelongo contends his sentence of life in prison without the possibility of parole is cruel and unusual punishment under the Eighth Amendment to the United States Constitution because the trial court failed to consider his youth before sentencing him.[8]  For purposes of evaluating this argument, we assume the trial court's cursory finding that Montelongo's upbringing did not reduce his culpability did not comply with *Miller*, which requires a court to consider multiple factors to determine whether a youthful offender is "irreparabl[y] corrupt[ ]" before sentencing him or her to life in prison without the possibility of parole.  (*Miller*, *supra*, 567 U.S. at pp. 479-480; see *People v. Gutierrez*, *supra*, 58 Cal.4th at pp. 1388-1389 [listing factors a court must consider to comply with *Miller*].)

---

[8]    In his reply brief Montelongo argues for the first time that his sentence also violates article I, section 17 of the California Constitution and deprived him of equal protection under the Fourteenth Amendment to the United States Constitution and article I, section 7 and article IV, section 16 of the California Constitution.  "'Withholding a point until the reply brief deprives the respondent of an opportunity to answer it . . . .  Hence, a point raised for the first time therein is deemed waived and will not be considered, unless good reason is shown for failure to present it before.'"  (*People v. Selivanov* (2016) 5 Cal.App.5th 726, 794; see *People v. Silveria and Travis* (2020) 10 Cal.5th 195, 255 ["'"[i]t is axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party"'"].)  Montelongo provides no explanation for why he raised these arguments for the first time in his reply brief and offers no substantive discussion of these issues.  Therefore, we do not address them.

The Eighth Amendment to the United States Constitution "guarantees individuals the right not to be subjected to excessive sanctions" and "flows from the basic "'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.""" (*Roper v. Simmons* (2005) 543 U.S. 551, 560 [125 S.Ct. 1183] (*Roper*).) To determine whether a punishment is cruel and unusual, "courts must look beyond historical conceptions to "'the evolving standards of decency that mark the progress of a maturing society.""" (*Graham v. Florida* (2010) 560 U.S. 48, 58 [130 S.Ct. 2011] (*Graham*).) "This is because '[t]he standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment. The standard itself remains the same, but its applicability must change as the basic mores of society change.'" (*Kennedy v. Louisiana* (2008) 554 U.S. 407, 419 [128 S.Ct. 2641]; see *People v. Gutierrez*, *supra*, 58 Cal.4th at p. 1374.)

In 2012 the United States Supreme Court held "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." (*Miller, supra,* 567 U.S. at p. 479.) Based on two lines of precedent, one holding that juvenile offenders are less culpable and more susceptible to reform than adults and the other that imposing the harshest punishment on a juvenile requires individualized sentencing that takes into account an offender's youth, the Supreme Court in *Miller* precluded a court from sentencing a juvenile to life without the possibility of parole without first considering a range of factors, including the juvenile's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences." (*Id.* at p. 477.) Relying on cases establishing

18

that "children are constitutionally different from adults for purposes of sentencing," the Supreme Court in *Miller* observed that "'developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds'" and that "those findings—of transient rashness, proclivity for risk, and inability to assess consequences—both lessened a child's 'moral culpability' and enhanced the prospect that, as the years go by and neurological development occurs, his "'deficiencies will be reformed.'""" (*Id.* at pp. 471-472, quoting *Graham*, *supra*, 560 U.S. at p. 68 and *Roper*, *supra*, 543 U.S. at p. 570.) The Supreme Court also stated that "the science and social science supporting [these] conclusions have become even stronger" in recent years. (*Miller,* at p. 472, fn. 5.)

The Supreme Court in *Miller* addressed the constitutionality of imposing mandatory sentences of life without the possibility of parole on offenders under the age of 18, and the cases on which the Supreme Court relied also considered Eighth Amendment challenges by juvenile offenders. (*Miller*, *supra*, 567 U.S. at p. 465; see *Graham, supra,* 560 U.S. at p. 79 [Eighth Amendment prohibits life without the possibility of parole for juvenile offenders who do not commit homicide]; *Roper*, *supra*, 543 U.S. at pp. 574-575 [Eighth Amendment prohibits execution of juvenile offenders].) For this reason, courts have limited the holdings of *Miller* to cases involving defendants under the age of 18. (See, e.g., *People v. Gamache* (2010) 48 Cal.4th 347, 405 [the United States Constitution prohibits the death penalty for defendants under 18 years old, but not for those 18 years of age and older]; *People v. Edwards* (2019) 34 Cal.App.5th 183, 190 [the functional equivalent of life without the possibility of parole is constitutional for a 19-year-old defendant]; *People v. Perez* (2016)

3 Cal.App.5th 612, 617-618 [the functional equivalent of life without the possibility of parole is constitutional for a 20-year-old defendant]; *People v. Abundio* (2013) 221 Cal.App.4th 1211, 1220-1221 [life without the possibility of parole is constitutional for an 18-year-old defendant]; *People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482 [the functional equivalent of life without the possibility of parole is constitutional for an 18-year-old defendant]; see also *People v. Gutierrez, supra*, 58 Cal.4th at p. 1380 [rejecting a presumption in favor of life without the possibility of parole for 16- to 17-year-old defendants convicted of special circumstance murder].) As the United States Supreme Court explained in *Roper*: "Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. For the reasons we have discussed, however, a line must be drawn.[9] . . . The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest." (*Roper, supra*, 543 U.S. at p. 574.)

---

9    These "reasons" included the inability of jurors or even experts to differentiate on a case-by-case basis between "the juvenile offender whose crime reflects unfortunate yet transient immaturity," and whose execution would therefore violate the Eighth Amendment, and "the rare juvenile offender whose crime reflects irreparable corruption" and whose execution therefore would not violate the Eighth Amendment. (*Roper, supra*, 543 U.S. at p. 573.)

Citing a bevy of recent scientific and legal developments, Montelongo argues the line the United States Supreme Court created in *Roper* between juvenile and adult offenders is arbitrary and, at a minimum, should be extended to 19 or older, as "[s]cience determines." But that is not our call to make. (See *People v. Perez, supra,* 3 Cal.App.5th at p. 617 ["Our nation's, and our state's, highest court have concluded 18 years old is the bright-line rule and we are bound by their holdings."]; *People v. Argeta, supra,* 210 Cal.App.4th at p. 1482 ["[w]e respect the line our society has drawn and which the United States Supreme Court has relied on for sentencing purposes"]; *United States v. Sierra* (2d Cir. 2019) 933 F.3d 95, 97 ["Since the Supreme Court has chosen to draw the constitutional line at the age of 18 for mandatory minimum life sentences, [citation] the defendants' age-based Eighth Amendment challenges to their sentences must fail."]; *United States v. Williston* (10th Cir. 2017) 862 F.3d 1023, 1040 ["The Supreme Court's decision to separate juvenile and adult offenders using the crude, but practicable, tool of an age cutoff, as opposed to a more painstaking case-by-case analysis, necessitates some element of arbitrariness in Eighth Amendment jurisprudence in this area. But such is the law."].) Unless and until the United States Supreme Court, the California Supreme Court, the Legislature, or the voters by initiative change the law, we are bound to apply it.

21

C.    *Montelongo Forfeited His Right To Challenge the Restitution Fine and Assessments*

1.    *Montelongo Forfeited His Challenge to the $10,000 Restitution Fine*

Section 1202.4, subdivision (b), states: "In every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record."  A restitution fine under section 1202.4, subdivision (b), "is intended to be, and is recognized as, additional punishment for a crime."  (*People v. Dueñas* (2019) 30 Cal.App.5th 1157, 1169 (*Dueñas*); accord, *People v. Belloso* (2019) 42 Cal.App.5th 647, 655 (*Belloso*), review granted Mar. 11, 2020, S259755.)  Under section 1202.4, subdivision (c), the trial court may not consider a defendant's ability to pay when imposing the minimum restitution fine of $300, but the court may consider the defendant's ability to pay if the court imposes a restitution fine above the minimum.  (*People v. Miracle* (2018) 6 Cal.5th 318, 356; see § 1202.4, subd. (d) ["[i]n setting the amount of the [restitution] fine . . . in excess of the minimum fine," the court "shall consider any relevant factors, including, but not limited to, the defendant's inability to pay"]; *Dueñas*, at p. 1170, fn. 6 ["a trial court may . . . consider a defendant's ability to pay if the court is considering imposing a restitution fine in excess of the statutory minimum amount"].)

Because the $10,000 restitution fine the trial court imposed far exceeded the statutory minimum of $300, Montelongo had the opportunity to argue he was unable to pay it, but he did not.  By failing to object and argue he did not have the ability to pay the $10,000 restitution fine, Montelongo forfeited the argument the

22

court violated his constitutional rights by imposing the fine without considering his ability to pay. (See *People v. Miracle, supra*, 6 Cal.5th at p. 356 ["[b]ecause [the] defendant did not object to the [restitution] fine at his sentencing hearing, he has forfeited his challenge"]; *People v. Avila* (2009) 46 Cal.4th 680, 729 ["in not adducing evidence of his inability to pay" a $10,000 restitution fine, the defendant "forfeited the argument"]; *People v. Smith* (2020) 46 Cal.App.5th 375, 395 ["a defendant forfeits a challenge to the trial court's imposition of a restitution fine above the statutory minimum for failing to consider his or her ability to pay if the defendant did not object in the trial court"]; *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033 [defendant "forfeited any ability-to-pay argument regarding the restitution fine by failing to object"].)

> 2. *Montelongo Also Forfeited His Challenge to the Assessments Under Section 1465.8 and Government Code Section 70373*

Section 1465.8, subdivision (a)(1), provides, in part: "To assist in funding court operations, an assessment of forty dollars ($40) shall be imposed on every conviction for a criminal offense." Government Code section 70373, subdivision (a)(1), provides, in part: "To ensure and maintain adequate funding for court facilities, an assessment shall be imposed on every conviction for a criminal offense . . . in the amount of thirty dollars ($30) for each misdemeanor or felony." In *Dueñas* this court held that "the assessment provisions of Government Code section 70373 and . . . section 1465.8, if imposed without a determination that the defendant is able to pay, are . . . fundamentally unfair," that "imposing these assessments upon indigent defendants without a

23

determination that they have the present ability to pay violates due process under both the United States Constitution and the California Constitution," and that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes [these] assessments." (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1164, 1168; accord, *Belloso*, *supra*, 42 Cal.App.5th at pp. 654-655.)

Montelongo, however, forfeited his argument the court violated his constitutional rights by imposing the assessments without determining his ability to pay. Montelongo argues he could not have anticipated *Dueñas*, which was decided after the trial court sentenced him, and thus he did not forfeit his challenge to the assessments. (See *People v. Castellano* (2019) 33 Cal.App.5th 485, 489 [defendant did not forfeit his contention the trial court violated due process in imposing assessments under section 1465.8 and Government Code section 70373 without determining his ability to pay by failing to object]; see also *Belloso*, *supra*, 42 Cal.App.5th at p. 662; *People v. Santos* (2019) 38 Cal.App.5th 923, 932; *People v. Johnson* (2019) 35 Cal.App.5th 134, 137-138.) By failing to object to the $10,000 restitution fine, however, Montelongo left no doubt he would not have challenged the much lower assessments even if he knew he had a right under *Dueñas* to request a hearing on his ability to pay. (See *People v. Smith*, *supra*, 46 Cal.App.5th at p. 395 [defendant forfeited his challenge to the assessments and fines because he "did not object in the trial court on the grounds that he was unable to pay, even though the trial court ordered him to pay the $10,000 statutory maximum restitution fine"]; *People v. Gutierrez*, *supra*, 35 Cal.App.5th at p. 1033 ["[a]s a practical matter, if [the defendant] chose not to object to a $10,000

restitution fine based on an inability to pay, he surely would not complain on similar grounds regarding an additional $1,300 in fees"]; but see *People v. Taylor* (2019) 43 Cal.App.5th 390, 400-401 [defendant did not forfeit *Dueñas* challenge to the court operations and facilities assessments, even though he did not object to the maximum $10,000 restitution fine, because the "defendant's inability to pay is just one among many factors the court should consider in setting the restitution fine above the minimum"].)

D.  *The Court's Sentencing Minute Order and the Abstract of Judgment Must Be Corrected*

The trial court did not impose a parole revocation fine under section 1202.45, subdivision (a), at the sentencing hearing. The November 16, 2018 minute order for that hearing, however, stated the court imposed a parole revocation fine on the murder count, despite Montelongo's sentence of life in prison without the possibility of parole. The abstract of judgment indicates the court imposed and stayed a $10,000 parole revocation fine, but it does not identify a specific count. Montelongo argues, the People concede, and we agree the court erred in imposing a parole revocation fine because the only sentence the court executed was a sentence of life without the possibility of parole. (See *People v. Gonzalez* (2016) 246 Cal.App.4th 1358, 1386 [because the defendants "were sentenced to life imprisonment without the possibility of parole, parole revocation fines are inapplicable"]; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1184 [where the defendant is "sentenced to life without the possibility of parole, there can be no parole, and therefore the parole revocation fine was improperly assessed"].) Even though the

25

court sentenced Montelongo to a term of three years on the conviction for robbery, the court stayed execution of that sentence under section 654. Thus, "the parole revocation fine, even though suspended, is unauthorized and must be stricken." (*People v. Carr* (2010) 190 Cal.App.4th 475, 482, fn. 6; see *People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1097, disapproved on another ground in *People v. Gutierrez, supra,* 58 Cal.4th at p. 1370.)

## DISPOSITION

The judgment is affirmed. The trial court is directed to correct the November 16, 2018 minute order and the abstract of judgment to strike the parole revocation fine under section 1202.45 and to forward a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.

SEGAL, J.

We concur:

PERLUSS, P. J.

FEUER, J.

26

SEGAL, J., Concurring.

As explained in the court's opinion, Montelongo's constitutional arguments fail.  I write separately to highlight the tension between Penal Code section 3051,[1] which Montelongo cites in support of his Eighth Amendment argument, and the United States Supreme Court's decisions in *Miller v. Alabama* (2012) 567 U.S. 460 [132 S.Ct. 2455] (*Miller*), *Graham v. Florida* (2010) 560 U.S. 48 [130 S.Ct. 2011] (*Graham*), and *Roper v. Simmons* (2005) 543 U.S. 551 [125 S.Ct. 1183] (*Roper*).

As discussed, the United States Supreme Court in *Miller* relied in part on *Graham* and *Roper* in holding that juvenile offenders are less blameworthy and more amendable to rehabilitation than their adult counterparts, thus making juveniles "'less deserving of the most severe punishments,'" including life in prison without the possibility of parole.  (See *Miller*, *supra*, 567 U.S. at p. 471, quoting *Graham*, *supra*, 560 U.S. at p. 68.)  The Supreme Court in *Miller* identified three "significant gaps" distinguishing juveniles from adults:  "First, children have a "'lack of maturity and an underdeveloped sense of responsibility,'" leading to recklessness, impulsivity, and heedless risk-taking.  [Citation.]  Second, children 'are more vulnerable . . . to negative influences and outside pressures,' including from their family and peers; they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings.  [Citation.]  And third, a child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].'"  (*Miller*, at p. 471.)  The Supreme Court based these

---

[1]     Statutory references are to the Penal Code.

conclusions on "what 'any parent knows,'" scientific research, and social science.  (*Ibid*.)  For example, in its 2005 decision in *Roper* the Supreme Court quoted a 2003 study observing that "'[o]nly a relatively small proportion of adolescents who experiment in risky or illegal activities develop entrenched patterns of problem behavior that persist into adulthood.'"  (*Roper*, *supra*, 543 U.S. at p. 570.)  In 2010 the Supreme Court in *Graham* cited more recent developments in psychology and brain science showing "fundamental differences between juvenile and adult minds" that caused juveniles to lack the same "behavior control" as adults.  (*Graham*, at p. 68.)  And, as stated in the court's opinion, in 2012 the Supreme Court in *Miller* recognized that the evidence discussed in *Roper* and *Graham* had "become even stronger."  (*Miller*, at p. 472, fn. 5.)

The Supreme Court in *Graham* observed that the state, by denying a juvenile nonhomicide offender the right to ever reenter the community, makes an irrevocable judgment about the offender's "value and place in society" that is not appropriate in light of a juvenile's capacity for change and limited moral culpability.  (*Graham*, *supra*, 560 U.S. at p. 74.)  The Supreme Court in *Miller* extended this reasoning to homicide offenders and emphasized that "the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes."  (*Miller*, *supra*, 567 U.S. at p. 472.)  In particular, the Supreme Court in *Miller* stated that nothing about juveniles' "distinctive (and transitory) mental traits and environmental vulnerabilities" was "crime-specific."  (*Id*. at p. 473.)  "Those features are evident in the same way, and to the same degree," when a juvenile

2

commits robbery or "when (as in [*Miller*]) a botched robbery turns into a killing." (*Ibid.*)

After *Graham*, but before *Miller*, the California Legislature added subdivision (d)(2) to section 1170 to address "concerns regarding sentences of life without parole for juvenile offenders." (*In re Kirchner* (2017) 2 Cal.5th 1040, 1049; see Assem. Com. on Appropriations, Analysis of Sen. Bill No. 9 (2011-2012 Reg. Sess.) as amended Aug. 15, 2011, pp. 3-6.) Section 1170, subdivision (d)(2), "provides an avenue for juvenile offenders serving terms of life without parole to seek recall of their sentences and resentencing to a term that includes an opportunity for parole." (*Kirchner*, at p. 1049; see *People v. Franklin* (2016) 63 Cal.4th 261, 281 [section 1170, subdivision (d)(2), "instructs the court to consider a variety of factors addressing [the defendant's] culpability for the original offense and efforts toward rehabilitation"].)

Following *Miller*, the Legislature enacted section 3051 to establish parole eligibility guidelines for juvenile offenders sentenced to lengthy prison terms. (Former § 3051, subd. (a)(1), added by Stats. 2013, ch. 312, § 4; see *In re Jones* (2019) 42 Cal.App.5th 477, 484 (conc. opn. of Pollak, J.) (*Jones*) ["Section 3051 was enacted in response to [*Miller* and *Graham*] and in recognition that '[e]xisting sentencing laws do not distinguish youth from adults.'"]; *People v. Jones* (2017) 7 Cal.App.5th 787, 817 [the Legislature enacted section 3051 in response to *Graham* and *Miller*].) In enacting section 3051, "the Legislature explained that 'youthfulness both lessens a juvenile's moral culpability and enhances the prospect that, as a youth matures into an adult and neurological development occurs, these individuals can become contributing members of society.'" (*In re Jenson* (2018)

3

24 Cal.App.5th 266, 276.) "Thus, the bill's purpose was 'to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity.'" (*Id.* at pp. 276-277; see Stats. 2013, ch. 312, § 1.) As enacted in 2013, section 3051, subdivision (h), excluded juvenile offenders sentenced to life without the possibility of parole because they were already eligible for resentencing under section 1170. (See Sen. Com. on Appropriations, Rep. on Sen. Bill No. 260 (2013-2014 Reg. Sess.) Aug. 14, 2013, p. 2.)

Meanwhile, the science and social science on which the United States Supreme Court relied in *Miller* and *Graham* showed that some differences between juvenile and adult brains persisted into the late teenage years and early 20s. (Brief for the American Psychological Association et al. as *Amici Curiae* filed in *Miller*, pp. 9-10, 28; Brief for the American Medical Association et al. as *Amici Curiae* filed in *Graham*, pp. 18, 20-22; Brief for the American Psychological Association et al. as *Amici Curiae* filed in *Graham*, p. 27.) In 2015 the Legislature acknowledged these advancements in the understanding of brain development and amended section 3051 to apply to offenders who committed crimes before they reached the age of 23. (Former § 3051, subd. (a)(1), added by Stats. 2015, ch. 471, § 1.) The 2015 amendments were based on "'[r]ecent scientific evidence on adolescent and young adult development and neuroscience show[ing] that certain areas of the brain—particularly those affecting judgment and decision-making—do not fully develop until the early- to mid-20s.'" (*Jones*, *supra*, 42 Cal.App.5th at pp. 484-485 (conc. opn. of Pollak, J.); see Sen. Com. on Public

4

Safety, Analysis of Sen. Bill No. 261 (2015-2016 Reg. Sess.) Apr. 28, 2015, p. D.) The author of the 2015 amendments cited "[v]arious studies by researchers from Stanford University (2009), University of Alberta (2011), and the National Institute of Mental Health (2011) all confirm[ing] that the process of brain development continues well beyond age 18." (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 261, *supra*, p. D.) The legislative history of the 2015 amendments also cited other California laws recognizing that young adults are different from older adults. For example, the Health and Human Services Agency Department of Youth and Community Restoration (previously the Department of Juvenile Justice) must detain and provide services and programming to some young adults until age 23. (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 261, *supra*, p. D.) California also extends foster care support up to age 21 and provides special protections and opportunities for young adults entering prison through age 22. (*Id.* at p. E.)

Senate Bill No. 261, which amended section 3051 in 2015 and raised the age of eligible youth offenders to 23, did not include corresponding amendments to section 1170 to allow for the recall and resentencing of 18- to 23-year-old offenders sentenced to life in prison without the possibility of parole. Senate Bill No. 261 also did not amend relevant portions of section 3051, subdivision (h), which excluded from the class of eligible offenders those sentenced to life in prison without the possibility of parole.[2] Thus, despite the Supreme Court's

---

[2] As amended by Senate Bill No. 261, the current version of section 3051, subdivision (h), also excludes offenders sentenced under the three strikes law (§§ 667, subds. (b)-(i), 1170.12), sex offenders sentenced under Jessica's Law (§ 667.61), and

5

pronouncement in *Miller* that the differences between fully developed and youthful brains are not "crime-specific," the Legislature excluded from the benefits of sections 1170 and 3051 young adult offenders who committed certain specific crimes; namely, those crimes subjecting them to life in prison without the possibility of parole.

In 2017 the Legislature again amended section 3051 to raise the age of eligible youth offenders to 25. (See § 3051, subd. (a)(1).) According to the author of Assembly Bill No. 1308, the legislation "'align[ed] public policy with scientific research . . . [that] show[ed] that certain areas of the brain, particularly those affecting judgment and decision-making, do not develop until the early-to-mid-20s.'" (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1308, as amended Mar. 30, 2017 (2017-2018 Reg. Sess.) Apr. 25, 2017, pp. 2-3.) Again, however, the Legislature did not amend section 3051, subdivision (h), which continues to deny a youthful offender parole hearing to young adults who committed their offenses when they were between 18 and 25 years of age and were sentenced to life without the possibility of parole. Thus, under section 3051, a young adult sentenced to an indeterminate prison term for premeditated first degree murder has an opportunity for parole, whereas Montelongo, who may not have intended to kill Brooks but was subject to a mandatory sentence of life without the possibility of parole (because the People did not seek the death penalty), does not. (Cf. *Graham*, *supra*, 560 U.S. at p. 70 [a sentence of life

---

individuals to whom the section would otherwise apply "but who, subsequent to attaining 26 years of age, commit[ ] an additional crime for which malice aforethought is a necessary element of the crime." (See *In re Jenson*, *supra*, 24 Cal.App.5th at pp. 277-278.)

6

without the possibility of parole "'means denial of hope; it means that good behavior and character improvement are immaterial'"]; *People v. Contreras* (2018) 4 Cal.5th 349, 366 (*Contreras*) ["a sentence of [life without parole] 'deprives the convict of the most basic liberties without giving hope of restoration,'" quoting *Graham*, at pp. 69-70].)

I believe section 3051's current treatment of young adult offenders like Montelongo conflicts with the California Supreme Court decisions that adopted and extended *Miller*. Shortly after the United States Supreme Court decided *Miller*, the California Supreme Court held in *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*) that sentencing a juvenile offender for a nonhomicide offense to a term functionally equivalent to life in prison without the possibility of parole violated the Eighth Amendment. (*Caballero*, at p. 268.) Citing *Miller*, the California Supreme Court in *Caballero* held the Eighth Amendment's proscription on sentences for juvenile offenders that do not allow them "to 'demonstrate growth and maturity' to try to secure [their] release" is not "'crime-specific.'" (*Caballero*, at pp. 267-268.)

In 2014 the California Supreme Court held in *People v. Gutierrez* (2014) 58 Cal.4th 1354 (*Gutierrez*) that the special circumstances murder statute "confers discretion on a trial court to sentence a 16- or 17-year-old juvenile convicted of special circumstance murder to life without parole or to 25 years to life, with no presumption in favor of life without parole." (*Id.* at p. 1360.) In interpreting section 190.5, subdivision (b), the California Supreme Court stated: "*Miller* made clear that its concerns about juveniles' lessened culpability and greater capacity for reform have force independent of the nature of their crimes. . . . *Graham* and *Roper* likewise indicated that the

7

mitigating features of youth can be dispositively relevant, whether the crime is a nonhomicide offense or a heinous murder punishable by death if committed by an adult.  [Citation.]  Although section 190.5(b) does not apply to every murder offense, it applies to a broad and diverse range of first degree murder offenses.  [Citations.]  To presume that all such offenses committed by 16 and 17 year olds merit a presumptive penalty of life without parole cannot be easily reconciled with *Miller*'s principle that 'the distinctive attributes of youth [that] diminish the penological justifications for imposing the harshest sentences on juvenile offenders' are not 'crime-specific.'" (*Gutierrez*, at pp. 1380-1381.)

And in 2018 the California Supreme Court held in *Contreras* that a functional sentence of life without the possibility of parole is unconstitutional for nonhomicide crimes committed by juveniles.  (*Contreras*, *supra*, 4 Cal.5th at p. 380.)  In response to a dissenting justice's argument that the trial court had taken the defendants' youth into account in sentencing them, respectively, to 50 and 58 years to life, the Supreme Court stated: "[T]he key holding of *Graham* is that 'in light of a juvenile nonhomicide offender's capacity for change and limited moral culpability' [citation], no sentencing court is permitted to render a judgment 'at the outset' that a juvenile nonhomicide offender is incorrigible [citation].  On remand, the sentencing of each defendant must be guided by the 'central intuition' of the high court's case law in this area—'that children who commit even heinous crimes are capable of change.'" (*Id.* at p. 380; see *Montgomery v. Louisiana* (2016) 577 U.S. __, __ [136 S.Ct. 718, 736].)

8

As Montelongo points out, the changes in the legal and scientific landscape since the United States Supreme Court decided *Roper* in 2005 suggest we should reconsider the propriety, wisdom, and perhaps even the constitutionality of imposing a mandatory sentence of life without the possibility of parole on an 18-year-old. (See *Graham*, *supra*, 560 U.S. at p. 58; *Gutierrez*, *supra*, 58 Cal.4th at p. 1374.) Citing the scientific advancements identified in *Miller* and discussed in the legislative history of section 3051, other states have joined California in moving "the point where society draws the line" between juveniles and adults. (*Roper*, *supra*, 543 U.S. at p. 574; see *Cruz v. United States* (D.Conn. Mar. 29, 2018, Civ. A. No. 11-CV-787 (JCH)) [2018 WL 1541898, p. 19] [collecting state laws similar to section 3051 that provide youthful parole hearings for offenders over the age of 18].) Laws in California (and other states) treat 18- to 21- year-old persons differently from persons over the age of 21, including laws that govern drinking alcohol, smoking cigarettes, buying and possessing firearms and ammunition, and protecting the welfare of children. (See Sen. Com. on Public Safety, Analysis of Sen. Bill No. 261, *supra*, pp. D-E; see generally Blume et. al., *Death by Numbers: Why Evolving Standards Compel Extending* Roper*'s Categorical Ban Against Executing Juveniles from Eighteen to Twenty-one* (2020) 98 Tex. L.Rev. 921, 935 [collecting state laws].)

And yet we are stuck with the line that the United States Supreme Court drew at 18 years old in *Roper* in 2005 and that the Legislature imported into section 3051. (See *Roper*, *supra*, 543 U.S. at p. 574; § 3051, subd. (b)(4); court's opn., *ante*, at pp. 20-21].) Whether and where the Legislature should draw a new line in section 3051 is not for us to say, but it may be time

9

for the Legislature to rethink the old *Roper* line.[3]  As the United States Supreme Court and the California Supreme Court have recognized, a juvenile offender's eligibility for a youthful parole hearing should not hinge on the crime he or she committed, the statute under which the prosecutor elected to charge him or her, or the sentence mandated by statute.  None of those factors is relevant to determining whether a young adult offender is irreparably corrupt.  (See *Miller*, *supra*, 567 U.S. at pp. 479-480; *Gutierrez*, *supra*, 58 Cal.4th at p. 1388.)

SEGAL, J.

_____

[3]    In his concurring opinion in *Jones*, *supra*, 42 Cal.App.5th 477 Justice Pollak, joined by one of his colleagues, suggested that section 3051 may deny equal protection to defendants who, like Montelongo, are similarly situated to other 18- to 25-year-olds for purposes of determining whether their brains are capable of outgrowing "the youthful impulses that led to the commission of their offenses," but who are nonetheless denied access to a youthful offender parole hearing because they were sentenced to life without the possibility of parole instead of a sentence with the possibility of parole.  (See *Jones*, at pp. 485-486 (conc. opn. of Pollak, J.).)  "The presumptive fact that the [life without the possibility of parole] sentence was based on a more serious offense provides no rational basis for the distinction because [section 3051] is not designed to determine the degree of appropriate punishment but to determine whether the individual has outgrown his or her criminality.  There is no reason to conclusively presume that one such person is more likely to have satisfactorily matured than the other." (*Jones,* at p. 486.)  This is particularly true where, as here, intent to kill is not an element of the crime that subjected the defendant to life in prison without the possibility of parole.

Court of Appeal, Second Appellate District, Division Seven - No. B294095

**S265597**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

_____

THE PEOPLE, Plaintiff and Respondent,

v.

GIOVANNY MONTELONGO, Defendant and Appellant.

_____

The petition for review is denied.

_____

*Chief Justice*

PEOPLE v. MONTELONGO

S265597

Concurring Statement by Justice Liu

In 2013, the Legislature passed Senate Bill No. 260 (2013–2014 Reg. Sess.), which enacted Penal Code section 3051. (All undesignated statutory references are to the Penal Code.) The bill required the Board of Parole Hearings to conduct youth offender parole hearings and consider release of offenders who committed specified crimes before the age of 18. (Legis. Counsel's Dig., Sen. Bill No. 260 (2013–2014 Reg. Sess.).) In establishing this parole eligibility mechanism, the Legislature sought to account for the fact that "youthfulness both lessens a juvenile's moral culpability and enhances the prospect that, as a youth matures into an adult and neurological development occurs, these individuals can become contributing members of society." (Stats. 2013, ch. 312, § 1.) It was "the intent of the Legislature to create a process by which growth and maturity of youthful offenders can be assessed and a meaningful opportunity for release established." (*Ibid.*)

Soon thereafter, the Legislature amended the age threshold for youth offenders to age 23 (Stats. 2015, ch. 471, § 2) and then age 25 (Stats. 2017, ch. 684, § 2.5). The Legislature made these changes in light of scientific evidence that "certain areas of the brain, particularly those affecting judgment and decision-making, do not develop until the early-to-mid-20s." (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1308 (2017–2018 Reg. Sess.) as amended Mar. 30, 2017, p. 2.) The Legislature also extended parole hearings in the 25th year of

incarceration to youth offenders sentenced to life imprisonment without the possibility of parole, but only for an offense committed before age 18. (*People v. Contreras* (2018) 4 Cal.5th 349, 381 (*Contreras*), citing § 3051, subd. (b)(4), as amended by Stats. 2017, ch. 684, § 1.5.)

I write to underscore that section 3051's parole eligibility scheme — specifically, its exclusion of persons sentenced to life without parole for offenses committed between ages 18 and 25 — stands in "tension" with *Miller v. Alabama* (2012) 567 U.S. 460 (*Miller*). (*People v. Montelongo* (2020) 55 Cal.App.5th 1016, 1036 (conc. opn. of Segal, J.) (*Montelongo*).)

*Miller* identified three significant differences between juveniles and adults that bear on culpability. "First, children have a ' "lack of maturity and an underdeveloped sense of responsibility," ' leading to recklessness, impulsivity, and heedless risk-taking. [Citation.] Second, children 'are more vulnerable . . . to negative influences and outside pressures,' including from their family and peers; they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings. [Citation.] And third, a child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].' " (*Miller, supra,* 567 U.S. at p. 471, citing *Roper v. Simmons* (2005) 543 U.S. 551, 569–570 (*Roper*).) "The Supreme Court based these conclusions on 'what "any parent knows," ' scientific research, and social science." (*Montelongo, supra,* 55 Cal.App.5th at p. 1036 (conc. opn. of Segal, J.), citing *Miller,* at p. 471.)

Crucially, *Miller* explained that in this context "none of what [high court precedent has] said about children . . . is crime-

specific." (*Miller*, *supra*, 567 U.S. at p. 473.) The distinctive attributes of youth that mitigate culpability — transitory mental traits and environmental vulnerabilities — " 'are evident in the same way, and to the same degree,' when a juvenile commits robbery or 'when (as in [*Miller*]) a botched robbery turns into a killing.' " (*Montelongo*, *supra*, 55 Cal.App.5th at p. 1037 (conc. opn. of Segal, J.).)

The Legislature has recognized that *Miller*'s observations about juveniles also apply to young adults up to age 25. (Stats. 2017, ch. 684, § 2.5.) Yet it has excluded certain youth offenders from parole hearings based on the type of crime they committed. In particular, section 3051 does not allow for resentencing of 18- to 25-year-old offenders convicted of special circumstance murder and sentenced to life in prison without the possibility of parole. (§ 3051, subd. (h).) I agree with Justice Segal that "a juvenile offender's eligibility for a youthful parole hearing should not hinge on the crime he or she committed, the statute under which the prosecutor elected to charge him or her, or the sentence mandated by statute. None of those factors is relevant to determining whether a young adult offender is irreparably corrupt." (*Montelongo*, *supra*, 55 Cal.App.5th at p. 1041 (conc. opn. of Segal, J.).) In light of the high court's clear statement that the mitigating attributes of youth are not "crime-specific" (*Miller*, *supra*, 567 U.S. at p. 473) and our Legislature's recognition that those attributes are found in young adults up to age 25, it is questionable whether there is a rational basis for section 3051's exclusion of 18- to 25-year-olds sentenced to life without parole.

The Court of Appeal declined to resolve whether section 3051 violates equal protection because defendant raised this argument for the first time in his reply brief. (See

*Montelongo*, *supra*, 55 Cal.App.5th at p. 1030, fn. 8.)  But, as Justice Segal noted, "under section 3051, a young adult sentenced to an indeterminate prison term for premeditated first degree murder has an opportunity for parole, whereas Montelongo, who may not have intended to kill Brooks but was subject to a mandatory sentence of life without the possibility of parole (because the People did not seek the death penalty), does not."  (*Id.* at p. 1039 (conc. opn. of Segal, J.).)  Indeed, the evidence in this case supported a finding of felony murder, which qualifies as first degree murder but does not require an intent to kill.  (§ 189, subd. (a).)

As we observed in *Contreras*, there is a colorable claim that section 3051's exclusion of certain juvenile offenders based on their controlling offense "violates principles of equal protection and the Eighth Amendment" or "constitutes 'unusual punishment' within the meaning of article I, section 17 of the California Constitution."  (*Contreras*, *supra*, 4 Cal.5th at p. 382; see *People v. Williams* (2020) 47 Cal.App.5th 475, review granted July 22, 2020, S262669; *People v. Edwards* (2019) 34 Cal.App.5th 183, 197, 199 ["section 3051's carve-out for One Strike defendants violates principles of equal protection" and is "unconstitutional on its face"].)  Because there is a substantial question whether section 3051's exclusion of 18- to 25-year-olds sentenced to life without parole violates equal protection, "there is good reason for legislative reconsideration" of the statute. (*In re Jones* (2019) 42 Cal.App.5th 477, 486–487 (conc. opn. of Pollak, J.).)

Further, in light of "changes in the legal and scientific landscape," I join Justice Segal's suggestion that the Legislature "reconsider the propriety, wisdom, and perhaps even the constitutionality of imposing a mandatory sentence of life

without the possibility of parole on an 18-year-old." (*Montelongo, supra,* 55 Cal.App.5th at p. 1040 (conc. opn. of Segal, J.); see *id.* at p. 1041 ["it may be time for the Legislature to rethink the old *Roper* line"].) Advances in scientific understanding have revealed that the ordinary process of neurological and cognitive development continues for several years past age 18, and our Legislature recognized as much when it extended youth offender parole eligibility to persons who committed their controlling offense at or before age 25. That recognition calls into question whether it is tenable, without an individualized showing of irreparable corruption, to lock up young adult offenders and throw away the key. If what the high court has said about juveniles also applies to young adults, then so does "the truth of *Miller*'s central intuition" that such offenders "who commit even heinous crimes are capable of change." (*Montgomery v. Louisiana* (2016) 577 U.S. __, __ [136 S.Ct. 718, 736].)

**LIU, J.**